FILED

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

16 MAY 12 P 2:00

| | |
|---|---|
| NORTHROP GRUMMAN TECHNICAL SERVICES, INC., ) ) ) ) | |
| Plaintiff, ) | Case No. 1:16cv534-JCC-IDD |
| v. ) | |
| DYNCORP INTERNATIONAL LLC, ) ) | |
| Defendant. ) ) | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1442(a), Northrop Grumman Technical Services, Inc. hereby

removes the above-styled action, which was initially filed in the Circuit Court of Fairfax County,

Virginia, bearing Civil No. 2015-3427, to this Court. In accordance with 28 U.S.C. § 1446(a), the

following is a short and plain statement of the grounds for removal:

1.      This dispute arises against the background of a series of federal investigations

questioning DynCorp's billing practices under a contract (the "Subcontract"), which DynCorp

entered into to help Northrop Grumman Technical Services, Inc. and its affiliates ("Northrop

Grumman") carry out the mission of the United States Department of Defense's Counter

Narco-Terrorism Technology Program Office ("CNTPO") in Afghanistan.  Ex. A (DynCorp

CNTPO Subcontract).  Northrop Grumman entered into a contract with the Government (the

"Prime Contract") in 2007 to support counter narcotics operations in Afghanistan and operated

throughout the CNTPO program under the supervision of the Government and pursuant to

guidance received from the Government regarding compliance with the Prime Contract.  DynCorp

entered into the Subcontract in 2007, on the understanding that it would be bound by requirements

of Northrop Grumman's Prime Contract, and that it would be bound by the Government's decisions related to the Subcontract. Ex. A at 21 (Subcontract Clause 23).

2.      An essential requirement of the Subcontract was that DynCorp's employees had to be adequately qualified and assigned to appropriate labor categories. Ex. B (CNTPO Labor Category Descriptions). Multiple federal entities have now expressed serious concerns about whether DynCorp properly assigned (or "mapped") its employees to the contractually established labor categories and whether DynCorp billed reasonable and not excessive hours for its employees over the life of the Subcontract. The Department of Defense Office of Inspector General's Office ("DODIG") issued a report in May 2014 questioning over $100 million in DynCorp's labor charges; the U.S. Department of Justice ("DOJ") is currently investigating DynCorp and has recently retained an auditor to assess DynCorp labor mapping, and the Army is undertaking a complete review of DynCorp's labor charges over the entire life of the Subcontract. Further concerns were raised by a *qui tam* complaint, *United States ex rel. Hollis and Egan v. DynCorp International, Inc.*, Case No. 1: 13cv698 (GBL/TRJ), filed by two DynCorp whistleblowers and unsealed in August 2014, that DynCorp actively concealed improper labor mapping from Northrop Grumman and reaped an unreasonable profit from its labor charges.

3.      As these allegations came to light, Northrop Grumman—as a responsible federal contractor—made repeated requests for substantiating documents and information from DynCorp to determine whether DynCorp's labor mapping and billing was consistent with the terms of the subcontract and guidance from the Government, and whether DynCorp's invoices could be submitted to the Government. Northrop Grumman had a right to this information under the Subcontract, which expressly required DynCorp to maintain adequate books and records and provide reasonable substantiating information on request. Ex. A at 12, 25 (Art. XIV.H.5;

Subcontract Clause 34). But instead of complying with these straightforward requests, DynCorp refused to provide the information necessary for Northrop Grumman to assess the propriety of DynCorp's labor charges. As a result, Northrop Grumman stopped submitting DynCorp's invoices to the Government, and informed DynCorp on November 26, 2014, that Northrop Grumman would reject the labor portion of all pending DynCorp invoices and place invoices for other direct costs in suspense.

4.      Still lacking the information to meaningfully review DynCorp's invoices, on March 13, 2015, Northrop Grumman filed a Complaint in the Circuit Court of Fairfax County, Virginia, against DynCorp seeking (1) specific performance of the contractual requirement to provide documentation and (2) breach of contract damages for invoices Northrop Grumman had paid DynCorp for, but was unable to submit to the Government. Northrop Grumman filed an Amended Complaint on June 29, 2015.

5.      On September 9, 2015, DynCorp filed a Counterclaim, alleging that Northrop Grumman had improperly withheld payment on invoices totaling over $40 million. DynCorp filed an Amended Counterclaim on November 16, 2015. DynCorp alleges that it acted "in accordance with the parties' agreement and course of conduct" and that Northrop improperly "changed course" by demanding additional information and questioning DynCorp's invoices. Am. Counterclaim ¶¶ 2, 3. DynCorp's allegations are based on Northrop Grumman's guidance as directed by the Government, and DynCorp's counterclaims all seek premature determination of a question that can only be decided by the Government: Whether DynCorp complied with the CNTPO Program's labor requirements, which are established by the Army's Task Orders and incorporated in the Subcontract.

6.    It was only through the discovery process, that Northrop Grumman eventually obtained much of the information it had been seeking from DynCorp about its labor mapping and billing practices, enabling Northrop Grumman finally to engage an expert to conduct a comprehensive analysis of DynCorp's labor charges. Because DynCorp continued to produce documents related to its employees' qualifications in discovery as late as March of this year—and because of the sheer volume of questioned labor charges during the over seven-year life of the Subcontract—Northrop Grumman's expert was only able to complete its analysis on April 26, 2016.

7.    Armed with the documentation only recently obtained from DynCorp through discovery, Northrop Grumman promptly submitted a claim for contract interpretation to its Army Contracting Officer on April 29, 2016 (the "Army Claim"), to obtain a definitive answer to the question whether DynCorp properly assigned its employees to labor categories under Army Task Orders 3, 15, 20, and 21. Ex. C. Under the provisions of the Contracts Disputes Act, 41 U.S.C. §§ 7101-7109 (the "CDA"), the Army will now decide the key question underlying DynCorp's counterclaims, and DynCorp will be bound by that determination. Under the CDA, nonmonetary claims, such as Northrop Grumman's request for contract interpretation, must be decided within sixty days. 41 U.S.C. § 7103(f)(1).

8.    Based on the Army Claim and the initiation of the CDA process, Northrop Grumman now removes this case under the federal officer removal statute, 28 U.S.C. § 1442. Northrop Grumman has operated throughout the CNTPO program pursuant to direction and guidance from the Government and has flowed down those requirements and guidance to its subcontractor. The Government will now decide through the CDA process whether DynCorp's labor mapping and billing practices were consistent with those requirements and guidance. Given

the serious outstanding questions about DynCorp's labor charges, Northrop Grumman is withholding payment until it receives direction to the contrary.

9.     Accordingly, now that the requirements of 28 U.S.C. § 1442 have been clearly and unequivocally satisfied, this case is properly removed to federal court.

### FACTUAL BACKGROUND

10.     On August 24, 2007, the U.S. Army Space and Missile Defense Command ("SMDC"), acting on behalf of the Counter Narco-Terrorism Technology Program Office, awarded Contract No. W9113M-07-D-0007 (the "Prime Contract") to Northrop Grumman. During the term of the Prime Contract, Northrop Grumman was awarded more than 70 different task orders, with detailed requirements from the Army, including what qualifications employees were required to possess and what information was required for a proper invoice.

11.     Northrop Grumman's conduct under the Prime Contract is subject to close supervision by the Army Space and Missile Defense Command and is governed by a detailed set of contractual provisions, federal regulations, and federal laws.

12.     Acting under the Prime Contract and pursuant to these federal rules and the approval of the Army, Northrop Grumman entered into the Subcontract with DynCorp to supply personnel to assist Northrop Grumman and the Army with various counter narco-terrorism missions under six Prime Contract Task Orders, including training pilots to fly drug interdiction missions in Afghanistan to prevent narcotics proceeds from financing terrorist activities. As stated in DynCorp's Amended Counterclaim: "On or about October 1, 2007, Northrop and DI entered into Subcontract Number GCNGC-07-039, an IDIQ subcontract (the 'Subcontract') to support the Prime Contract. Through task orders and associated purchase orders under the Subcontract, Northrop sought DI's support in the form of 'the necessary goods and services required by the

DOD CNTPO to support the [CNT] mission of the Department of Defense, other Federal agencies, partner nations and State and local authorities.'" Am. Counterclaim. ¶ 15.

13.    The Subcontract incorporates many of the requirements of the Prime Contract. Because of this, many of the decisions made by the Army under the Prime Contract also apply to the Subcontract. To ensure consistent application of the Prime Contract and the Subcontract, the Subcontract provides that decisions made by the Government are binding on DynCorp and that DynCorp must use the dispute resolution process set forth in the Contract Disputes Act if it "disagrees with any such decision made by the Government." Ex. A at 21 (Subcontract Clause No. 23). The Subcontract also incorporates numerous clauses from the Federal Acquisition Regulations, which the Subcontract provides are to be "construed and interpreted according to the federal law of Government contracts as enunciated and applied by federal statutes and regulations." *Id.* at 18 (Subcontract Clause No. 6).

14.    One important requirement flowed down to DynCorp was the Prime Contract's labor categories, incorporated in the Subcontract as Attachment B. Ex. B. The Prime Contract contained a set of labor categories to which employees working under the Prime Contract and its associated Task Orders were to be assigned or "mapped." The labor categories included a description of the duties to be performed and the required qualifications and experience, and each labor category has an associated billing rate. These labor categories and their qualifications set the parameters for how proposals submitted to Northrop Grumman and the Government for individual Task Orders were priced and for how labor should be billed by Northrop Grumman and its subcontractors.

15.    Under its Task Orders, DynCorp submitted cost proposals to Northrop Grumman that set forth the price of the work to be performed. DynCorp calculated its price by assigning the

work to be accomplished by DynCorp employees to the labor categories established by the Prime

Contract, and by using the associated rate.  Northrop Grumman submitted the information in

DynCorp's proposals to the Army for approval and DynCorp submitted supplemental information

directly to the Army.

16.     DynCorp invoiced for services performed by its personnel under the six TOs by

submitting invoices containing labor hours for each employee, the assigned labor category for

such employee, and the hourly rate for such employee.  DynCorp alleges that the labor categories

in the Prime Contract did not match the kinds of labor actually necessary for performing the terms

of the Subcontract, and it admits that it did not adhere to the labor category descriptions.  Am.

Counterclaim ¶ 30.

17.     During the course of performance of the Prime Contract and the Subcontract, the

Government repeatedly provided direction to Northrop Grumman on the subject of labor mapping,

which Northrop Grumman in turn provided to DynCorp.

18.     In September 2007, at the outset of the CNTPO program, the Government

instructed Northrop Grumman and its subcontractors to "find a way to fit the work … under the

existing labor categories."  Ex. C at 61 (Exhibit 4 to Army Claim, September 17, 2007 email from

Susan Purdue).  Northrop Grumman passed along this guidance from the Government to "fit the

work" within the existing labor categories to DynCorp.  *Id. See also* Am. Counterclaim ¶ 20

("Northrop advised DI that the Government had dictated that no new positions could be added to

the CNTPO labor categories, and that DI should assign (or "map") each of its employees

"somewhere somehow" into the CNTPO labor categories list.").

19.     In 2013, due in part to questions raised by the ongoing DODIG investigation,

DynCorp's suspension of invoicing, and negotiations concerning a new pricing proposal, Northrop

Grumman sought further guidance from the Government on how its employees and DynCorp's employees should be mapped to labor categories. In August 2013, the Contracting Officer issued a memorandum indicating that the Government was willing to waive the labor category qualifications for a specific list of Northrop Grumman and DynCorp employees. Ex. D. In a letter dated August 26, 2013, Northrop Grumman communicated this direction to DynCorp. Ex. E; *see also* Am. Countercl. ¶¶ 26-27.

20.     On June 16, 2014, the Government instructed Northrop Grumman that it was rescinding the August 2013 memorandum, and that future requests for labor category waivers would have to be approved by the Contracting Officer. Exs. F, G.

21.     Consistent with this Government direction, and in light of the allegations raised in the May 2014 DODIG Report, Northrop Grumman sent DynCorp a series of letters seeking information to allow Northrop Grumman to assess DynCorp's compliance with the Subcontract and the Government's guidance, and directing DynCorp to take steps to ensure compliance. First Am. Compl. Exs. 1-8. DynCorp refused those requests. As a basis for its refusal and its claims against Northrop Grumman, DynCorp alleges that its labor mapping assignments over the course of the Subcontract were consistent with the Government's and Northrop Grumman's guidance, Am. Counterclaim ¶ 24, and that DI's personnel were assigned to labor categories that were "*disclosed to and approved by Northrop and the Government*," *id.* ¶ 7. DynCorp's claims are thus explicitly based on an interpretation of the Government' direction to Northrop Grumman.

22.     Although not raised in its Amended Counterclaim, DynCorp also now argues that mapping its employees to labor categories was not required at all. DynCorp bases this new argument on its theory that the Subcontract qualifies as a Firm Fixed Price-Level of Effort ("FFP-LOE") Subcontract under federal contracting law. Under this theory, DynCorp argues that

it was to receive a total, firm-fixed price in exchange for performing a total number of authorized labor hours, regardless of whether its employees were mapped to appropriate categories specified in the Subcontract. As noted, this theory was not articulated in DynCorp's Amended Counterclaim, but it is the primary focus of the expert disclosure served by DynCorp on April 26, 2016. Ex. H at 10-14, 17-18.

23. On April 22, 2016, Northrop Grumman—finally armed with the documentation regarding DynCorp's labor-mapping practices that it obtained through discovery—promptly submitted the Army Claim. Ex. C. Northrop Grumman submitted the Army Claim to obtain a definitive answer to the question whether DynCorp properly assigned its employees to labor categories under Army Task Orders 3, 15, 20, and 21. *Id.* at 1 ("By this claim, Northrop Grumman seeks a contract interpretation and final decision determining the extent to which DynCorp properly assigned its personnel to labor categories in a manner permitted under these Task Orders."). In deciding this claim, the Army will necessarily address (1) the issues raised by DynCorp's claims concerning the interpretation of the Government' direction to Northrop Grumman; and (2) DynCorp's argument that the Subcontract qualifies as a Firm Fixed Price-Level of Effort ("FFP-LOE") Subcontract.

## REMOVAL IS AUTHORIZED BY 28 U.S.C. §§ 1442(a) AND (d)

24. The central concern of section 1442 is that a federal officer or agent shall not be forced to answer for acts performed under color of his office in anything but a federal forum. As a result, section 1442 is to be interpreted broadly, in favor of removal. *Watson v. Philip Morris Cos.* 551 U.S. 142, 147 (2007) ("This Court has made clear that the statute must be 'liberally construed.'"); *Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 571, 576 (4th Cir. 1989) ("This court has held that the right of removal conferred by § 1442(a)(1) is to be broadly

construed."); *Stephenson v. Nassif*, __ F. Supp. 3d __, 2015 WL 9450614, at *3 (E.D. Va. Dec. 21, 2015) ("In light of *Watson*, it is pellucid that the broad language of § 1442(a)(1) must be applied in a manner that effectuates the central congressional policy of securing a federal forum for persons who assist the federal government in a manner that risks the imposition of state law liability.").[1]

25.     This proceeding is removable under section 1442, because it meets each of the specific criteria of the statute. To qualify for removal under section 1442, the removing party must establish (1) that it is a "person," (2) who is "acting under" a federal officer or agency, (3) that the claims brought against it are "for [or relating to] any act under color of federal office" and (4) that the party has a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 124-25, 129-34 (1989).

26.     Under section 1442, removal jurisdiction does not depend on an evaluation of the merits of the defenses. *See, e.g., Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999). Rather, the removing party's theory of the case is accepted as true and plausible inferences are drawn in its favor. *See id.* ("Accordingly, we credit the [removing parties'] theory of the case for purposes of both elements of our jurisdictional inquiry and conclude that the [removing parties] have made an adequate threshold showing that the suit is 'for a[n] act under color of office.'"); *see also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).

27.     A federal contractor "acts under" a federal officer or agency for purposes of section 1442(a) when its actions "involve an effort to *assist*, or to help *carry out*, the duties or tasks of the

---

[1] The standard for removal under 28 U.S.C. § 1442, the federal officer removal statute, stands in contrast to removal under 28 U.S.C. § 1441, the general removal statute. Whereas removal under § 1441 is construed strictly, *see Maryland Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005), the "right of removal under § 1442(a)(1) is to be broadly construed" and "should not be frustrated by a 'a narrow, grudging interpretation' of the statute," *Kolibash*, 872 F.2d at 576.

federal superior." *Watson*, 551 U.S. at 152 (emphasis in original). Federal contractors act under a federal agency when they help the Government "produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Id.* at 153. A private contractor acts under a federal agency when it provides a service that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 154.

28.     Northrop Grumman was "acting under" the Army because, as a government defense contractor, its relationship with the Army "involv[ed] detailed regulation, monitoring, [and] supervision," *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 468 (3d Cir. 2015), and the federal government was using Northrop Grumman to "achieve an end it would have otherwise used its own agents to complete"—provisions of services in support of the Army's counter-narcoterrorism efforts, *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). Moreover, the Army exercised "subjection, guidance, or control" over Northrop Grumman, and Northrop Grumman "assist[ed]" and "help[ed] carry out" the Army's mission. *Watson*, 551 U.S. at 151-52.

29.     Most relevant to this dispute, the Government has provided repeated direction to Northrop Grumman with respect to the proper assignment of employees to labor categories. The Government directed Northrop Grumman that it and its subcontractors should "fit the work" to the existing labor categories, Ex. C at 61, that certain Northrop Grumman and DynCorp employees were waived into labor categories for which they did not meet the qualifications, Ex. D, that Northrop Grumman and its subcontractors would have to obtain individualized waivers from the Contracting Officer for any additional employees who did not reasonably meet the qualifications of the assigned labor category, *id.*, and eventually that the Government was rescinding its prior

waiver agreement. Exs. F, G. Northrop Grumman did not have the discretion to adopt a different approach, but was contractually bound to comply with this guidance. Likewise, when the Government issues a final decision on Northrop Grumman's claim, Northrop Grumman—and DynCorp—will be bound by the Government's direction. Where, as here, a private contractor acts pursuant to a federal directive that that the Government would otherwise be required to enforce itself if there was no private contract, the contractor is "help[ing] carry out' a federal function." *Stephenson*, 2015 WL 9450614, at *4.

30. A proceeding is "for or relates to" an act made under color of office if there is a "connection" or "association" between the act in question and the federal office. *See Def. Ass'n of Philadelphia*, 790 F.3d at 471 ("[I]t is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office."); *Mesa,* 489 U.S. at 131-32 ("There must be a causal connection between what the officer has done under asserted official authority and the state prosecution. ... But the statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority.'"); *Stephenson*, 2015 WL 9450614, at *2 (there must be "a causal nexus" between the removing party's "actions under color of a federal office" and the claims against the removing party). This "causal connection" prong is satisfied here because DynCorp's counterclaims are clearly connected to or associated with Northrop Grumman's performance of the Prime Contract, its work supporting the Army's CNTPO mission, and its efforts to implement the guidance from the Government on labor mapping practices. In particular, DynCorp's counterclaims allege that Northrop Grumman's demands for information and withholding of payment are inconsistent with the Government's direction with respect to labor mapping assignments; Northrop Grumman argues that it is simply enforcing the contractual requirements imposed by the Government.

31.     A permissive standard governs the "colorable federal defense" prong: "Courts have imposed few limitations on what qualifies as a colorable federal defense.  At its core, the defense prong requires that the defendant raise a claim that is 'defensive' and 'based in federal law.'" *Isaacson*, 517 F.3d at 138.  "What matters is that a defense raises a federal question, not that a federal duty forms the defense." *Def. Ass'n of Philadelphia*, 790 F.3d at 473.  And the party "seeking removal under § 1442(a)(1) 'need not prove that he will actually prevail on his federal immunity defense in order to obtain removal; indeed, one of the most important reasons for removal is to have the validity of the [federal] defense of official immunity tried in a federal court" *Stephenson*, 2015 WL 9450614, at \*5 (quoting *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994)).  Rather, the federal defense need only be "colorable." *Id.*

32.     Now that it has initiated the CDA process, Northrop Grumman has a colorable federal defense to DynCorp's counterclaims.  The CDA process is now the proper forum to address the issues raised by DynCorp's counterclaims and has rendered DynCorp's counterclaims unripe for judicial determination.  It is the Contracting Officer who will address whether DynCorp's labor charges are appropriate.  The question raised by DynCorp's counterclaims—whether DynCorp complied with the contractual labor mapping requirements and the Contracting Officer's directives—is exactly the same as what the Contracting Officer will answer in resolving Northrop Grumman's claim.  As the Subcontract provides that the Contracting Officer's decision on Northrop Grumman's claim will be binding on both Northrop Grumman and DynCorp, it would be improper to proceed with DynCorp's counterclaims until the Army makes a final determination.  Ex. A at 21 (Subcontract Clause 23).  In deciding the claim for contract interpretation, the Army is exercising "special competence" over the federal contracting issues concerning DynCorp's labor mapping assignments, including its own directives issued

regarding how employees should be mapped to the contractual labor categories. *In re Bulldog Trucking, Inc.*, 66 F.3d 1390, 1399 (4th Cir. 1995) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)); *see also In re Plum Run Serv. Corp.*, 167 B.R. 460, 466 (Bankr. S.D. Ohio 1994) ("Given that the vast majority of this case involves government contractual matters that are specifically, routinely, and ably handled by the ASBCA [Armed Services Board of Contract Appeals], this Court finds that the ASBCA is the proper forum."); *cf. RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996) (subcontractor's claims against general contractor preempted under CDA, because they were "claims relating to a government contract," and should have been submitted to the appropriate contracting officer). Because the Army is the appropriate federal executive agency to decide these issues, the judiciary should not decide DynCorp's counterclaims while the CDA process is pending. Furthermore, if DynCorp's counterclaims are allowed to proceed simultaneously with the CDA process, there is a serious risk that the proceedings will result in inconsistent judgments. For example, if the Government finds DynCorp's labor mapping assignments improper in deciding the claim, Northrop Grumman will have an "official justification" for refusing to pay, undermining any court decision to the contrary. *See, e.g., CRGT, Inc. v. Northrop Grumman Sys. Corp.*, 2012 WL 3776369, at *2 (E.D. Va. Aug. 28, 2012) ("Defenses such as sovereign immunity, official justification, and reliance on regulatory prohibitions have been deemed 'colorable' federal defenses."). Until the CDA process is complete, DynCorp's counterclaims are not ripe and therefore not justiciable.

## NOTICE

33.     Under the provisions of 28 U.S.C. §§ 1442 and 1446, Northrop Grumman has the right to remove to federal court the proceeding captioned *Northrop Grumman Technical Services,*

*Inc., v. DynCorp International LLC,* CL No. 2015-3427, pending in the Circuit Court of Fairfax County, Virginia.

      34.     As this proceeding is pending within the United States District Court for the Eastern District of Virginia, Alexandria Division, removal is proper in this Court.  28 U.S.C. § 1446(a).

      35.     This notice of removal is timely because it was filed "within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable," in accordance with 28 U.S.C. § 1446(b)(3).

      36.     A notice of the filing of this Notice of Removal is being filed promptly with the Clerk of the Court of for Fairfax County, in accordance with 28 U.S.C. § 1446(d).

      37.     A copy of all process, pleadings, and orders served upon Northrop Grumman in this proceeding is attached here in accordance with 28 U.S.C. § 1446(a).

Dated: May 12, 2016

By:  SUSAN R. PODOLSKY

Susan R. Podolsky
**LAW OFFICES OF SUSAN R. PODOLSKY**
Virginia State Bar No. 27891
spodolsky@podolskylaw.com
1800 Diagonal Road
Suite 600
Alexandria, VA 22314
Telephone: (571) 366-1702
Facsimile: (703) 647-6009

**BLANKINGSHIP & KEITH, PC**
William B. Porter
Virginia State Bar No. 41798
4020 University Drive, Suite 300
Fairfax, Virginia 22030
Telephone: (703) 691-1235
WPorter@bklawva.com

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Anne Bluth Perry (*pro hac vice pending*)
aperry@sheppardmullin.com
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
Telephone: (202) 747-1900
Facsimile: (202) 747-1901

**WILMER CUTLER PICKERING HALE & DORR LLP**
Edward N. Siskel (*pro hac vice pending*)
edward.siskel@wilmerhale.com
Carl J. Nichols
Virginia State Bar No. 43065
carl.nichols@wilmerhale.com
Madhu Chugh (*pro hac vice pending*)
madhu.chugh@wilmerhale.com
P. Randolph Seybold
Virginia State Bar No. 73596
randy.seybold@wilmerhale.com
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Susan R. Podolsky, certify that on May 12, 2016, a copy of the foregoing was served via electronic mail and by hand delivery on:

Attison L. Barnes III
Wiley Rein LLP
1776 K Street, N.W.
Washington, D.C. 20006
abarnes@wileyrein.com

and

Richard C. Sullivan, Jr.
Bean Kinney & Korman PC
2300 Wilson Boulevard, Suite 700
Arlington, VA 22201
rsullivan@beankinney.com

Counsel for Defendant DynCorp International LLC

Susan R. Podolsky