Exhibit 10

IN THE FAIRFAX COUNTY CIRCUIT COURT

FILED
COURT SERVICES
2015 JUN 29 PM 3: 17
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

NORTHROP GRUMMAN TECHNICAL  )
   SERVICES, INC.,  )
                                 )
     Plaintiff,  )
          v.  )
                                 )
DYNCORP INTERNATIONAL LLC,  )   CL No. 2015-03427
                                 )
     Defendant.  )

## FIRST AMENDED COMPLAINT

Plaintiff Northrop Grumman Technical Services, Inc. ("Northrop Grumman") complains of defendant DynCorp International LLC ("DynCorp"), and its successors and assigns, as follows:

### NATURE OF THE CLAIM

1. This is an action for specific performance and breach of contract brought by Northrop Grumman to (1) compel defendants to fulfill their contractual obligations and produce all documentation to substantiate invoices submitted to Northrop Grumman relating to labor charges under the subcontract (Number GCNGS-07-039) between Northrop Grumman and defendant DynCorp (the "Subcontract") and (2) recover damages incurred by Northrop Grumman as a result of DynCorp's breaches of contract.

2. Since 2007, Northrop Grumman has been supporting the United States Government's ("Government") efforts in Afghanistan to combat narcotics trafficking and its role in financing terrorist activities throughout the world. Northrop Grumman subcontracted with DynCorp to supply personnel to assist in certain of the counter narco-terrorism missions. The Subcontract required DynCorp, among other things, to maintain adequate books and records

supporting its invoices and to provide such documentation to Northrop Grumman when requested to substantiate invoices DynCorp submitted for payment. DynCorp's compliance with these requirements is critical so that Northrop Grumman can confirm whether DynCorp has supplied properly qualified personnel and submitted appropriate invoices. That confirmation is important for multiple reasons, including Northrop Grumman's payment of DynCorp invoices and Northrop Grumman's ability to certify the validity of such costs when invoicing the Government.

3. Over time Northrop Grumman has become increasingly concerned about certain of DynCorp's practices. Northrop Grumman has repeatedly requested that DynCorp substantiate its invoices, including by providing resumes, information about employee qualifications, time records, and licenses and certifications, where applicable, to demonstrate that the DynCorp workshare was performed by qualified personnel and was billed appropriately.

4. In clear breach of its contractual obligations, DynCorp has repeatedly refused to provide such supporting records as required by the Subcontract. DynCorp's breach has thus put Northrop Grumman in the unacceptable position of not being able to fully substantiate the work performed by DynCorp. As a result, Northrop Grumman has been unable to invoice the Government for over a year. Despite repeated notice to DynCorp and multiple opportunities to cure, and even after Northrop Grumman exercised rights under the Subcontract to withhold certain payments in partial offset, DynCorp has continued to fail to produce the requested documentation. DynCorp has caused and is continuing to cause significant harm to Northrop Grumman, both financial and reputational.

5. Accordingly, Northrop Grumman seeks an order from this Court (1) directing DynCorp to produce the records in its possession required by the Subcontract that would allow

Northrop Grumman to substantiate the invoices, as set forth in more detail herein, and (2) awarding Northrop Grumman damages resulting from DynCorp's breach of its contractual duties to maintain and produce on request those documents to substantiate its invoices.

## THE PARTIES

6. Plaintiff Northrop Grumman Technical Services, Inc. is an Oklahoma corporation with its principal place of business in Herndon, Virginia. Northrop Grumman Technical Services, Inc. is the signatory to the Subcontract. Northrop Grumman Technical Services, Inc., together with its affiliates, is a leading global security company providing systems, products and solutions in unmanned systems, cyber, C4ISR, and logistics and modernization to government and commercial customers worldwide.

7. Defendant DynCorp International LLC is a Delaware corporation with its principal place of business in McLean, Virginia. DynCorp International LLC is a subsidiary of DynCorp International Inc., a Delaware company with its principal place of business in McLean, Virginia, and its ultimate corporate parent is Delta Tucker Holdings, Inc., a Delaware company, which is indirectly held by Cerberus Capital Management, L.P., a Delaware company headquartered in New York, New York.

8. DynCorp International LLC entered into the Subcontract from its Falls Church, Virginia office and is the legal entity currently responsible for performing the Subcontract. DynCorp International LLC, together with its successors, assigns, and parents, is responsible for any damages to Northrop Grumman Technical Services, Inc. resulting from DynCorp's breach of the Subcontract.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action pursuant to Va. Code § 17.1-513, which entrusts this Court and all Virginia circuit courts with original and general jurisdiction of civil cases seeking the relief requested herein.

10. The Court has personal jurisdiction over defendant DynCorp International LLC in that it has its principal place of business in Fairfax County even though it is incorporated in the State of Delaware.

11. Venue is proper in this Court under Va. Code § 8.01-262 in that defendant DynCorp International LLC has its principal place of business in Fairfax County, Virginia and, upon information and belief, regularly conducts substantial business activity in Fairfax County, Virginia. Certain fact witnesses and evidence of the activities discussed herein reside, upon information and belief, in Fairfax County, Virginia. Venue is also proper in this Court under Va. Code § 8.01-261 in that the injunctive relief requested herein would be undertaken, upon information and belief, between the offices of plaintiff and defendant in Fairfax County, Virginia.

## FACTUAL BACKGROUND

12. On August 24, 2007, the U.S. Army Space and Missile Defense Command ("SMDC"), acting on behalf of the Counter Narco-Terrorism Technology Program Office ("CNTPO"), awarded Contract No. W9113M-07-D-0007 (the "Prime Contract") to Northrop Grumman's TASC division.

13. Under the Prime Contract, Northrop Grumman supports efforts by the Government in Afghanistan and elsewhere to counteract the narcotics trade that finances many terrorist organizations. The Prime Contract is an indefinite-delivery, indefinite-quantity

4

("IDIQ") contract under which the Government issues task orders ("TOs" or "Task Orders") for various activities.

14. At approximately the same time as the Prime Contract award, SMDC awarded similar IDIQ contracts to four other Prime Contractors. Northrop Grumman and the other Prime Contractors were invited from time to time to submit proposals in response to task order requirements packages ("TORPs") issued under the IDIQ Prime Contracts.

### Northrop Grumman's Subcontract With DynCorp

15. Northrop Grumman entered into the Subcontract with DynCorp as of October 1, 2007.

16. The Subcontract was signed by John W. Supina on October 2, 2007, on behalf of DynCorp International LLC with its office then at 3190 Fairview Park Drive, Suite 700, Falls Church, Virginia.

17. The Subcontract calls for DynCorp to provide personnel and materials to Northrop Grumman to support its performance under Task Orders issued by the Government under the Prime Contract. Many of the DynCorp personnel were to perform services in locations in Afghanistan and elsewhere.

18. The Subcontract explicitly requires DynCorp to provide records to support its invoiced amounts upon request by Northrop Grumman.

19. Pursuant to the Subcontract, Northrop Grumman issued six TOs to DynCorp to provide services and materials with respect to certain TOs awarded to Northrop Grumman by the Government under the Prime Contract.

20. The Subcontract and associated Task Orders incorporate the Prime Contract's CNTPO labor category descriptions, which include a description of the duties, experience, and

5

qualifications for each labor category to which performing employees were assigned or "mapped," and ceiling labor rates for each labor category.

21. DynCorp proposed hourly rates for each of the labor categories to which it assigned its employees. These labor categories were included in the Subcontract between Northrop Grumman and DynCorp.

**DynCorp Has Explicit Contractual Obligations To Substantiate All Its Invoices**

22. The Subcontract requires the Seller, defendant DynCorp, to maintain books and records to substantiate all its costs and invoices:

> Subcontractor shall maintain adequate books and records relating to this Agreement showing all direct costs including labor, travel, materials, other direct costs and lower-tier subcontractor's direct costs with applicable burden rates. Such records shall be made available to the Customer for examination and audit at reasonable times at Subcontractor's facility until the expiration of three years after final payment hereunder, or of the time periods for the particular records specified in Subpart 4.7 of the Federal Acquisition Regulation (48 CFR 4.7), whichever expires earlier. (Article XIV.H.5.)

23. The Subcontract requires the Seller, DynCorp, to provide records to substantiate its invoices: "Seller shall also provide such evidence as Buyer may reasonably require in support of the invoice." (Clause No. 34.b.)

24. The Subcontract also requires DynCorp to "substantiate invoices or vouchers by evidence of actual payment and by individual daily job timecards, or other substantiation." (Article VIII.A.2(a)(1).)

25. The Subcontract makes clear that any payment of invoices by Northrop Grumman "shall not constitute approval or acceptance of Services or Products rendered. At any time prior to final payment under this Order, Buyer may have invoices audited as to validity. Payment of Seller's invoices shall be subject to adjustment for any amounts found upon audit or otherwise to have been improperly invoiced." (Clause No. 34.b.)

26. The Subcontract gives Northrop Grumman a broad right to set off amounts owing by DynCorp against amounts payable, without regard to the type of cost being offset or the task order under which the offset is due. The clause provides as follows:

> Buyer shall be entitled at all times to set off any amount owing at any time from Seller to Buyer, or any of its affiliated companies, against any amount payable at any time by Buyer or any of its affiliated companies to Seller. (Clause No. 31.)

27. The Subcontract also explicitly requires DynCorp promptly to pay Northrop Grumman amounts that Northrop Grumman may be ordered to refund or credit to the Government:

> If, as a result of any decision or judgment that is binding upon Seller and Buyer, Buyer is unable to obtain reimbursement from the Government under the [P]rime [C]ontract for, or is required to refund or credit to the Government, any amount with respect to any item of cost or fee for which Buyer has reimbursed Seller, Seller shall, on demand, promptly repay such amount to Buyer. (Clause No. 23.e.)

28. DynCorp invoiced for services performed by its personnel under the six TOs by submitting invoices containing labor hours for each employee, the assigned labor category for such employee, and the hourly rate for such employee.

29. DynCorp certified that it had complied with contractual requirements by including the following language in each of its invoices: "I certify that all payments requested [sic] for the appropriate purposes and in accordance with the agreements set forth in the contract."

30. Northrop Grumman reviewed these invoices and included DynCorp's invoiced amounts in the invoices Northrop Grumman submitted to the Government under the various TOs issued under the Prime Contract. When invoicing the Government, Northrop Grumman certified that the invoices were accurate, relying in part on DynCorp's representation and certifications that the DynCorp invoices were accurate.

### DynCorp Repeatedly Fails to Meet Its Contractual Obligations

31. In May 2013, the Department of Defense Office of Inspector General ("DOD OIG") contacted Northrop Grumman to request assistance with the DOD OIG's audit of DynCorp. Northrop Grumman cooperated with the DOD OIG's audit. Northrop Grumman repeatedly asked DynCorp to provide the necessary underlying documentation to demonstrate the appropriateness of DynCorp's invoices as required under the Subcontract. Although DynCorp provided certain documents, including resumes for some of its employees, to the DOD OIG audit team, DynCorp refused to provide these documents to Northrop Grumman. DynCorp has repeatedly breached its obligation under the Subcontract by failing to provide the requested materials, despite Northrop Grumman's continued requests.

32. On May 19, 2014, Northrop Grumman learned from an article in the *Washington Post* that the DOD OIG had issued an audit report questioning the propriety of $123.1 million of the labor costs that DynCorp had invoiced to Northrop Grumman under the six TOs.

33. DOD OIG Report No. DODIG-2014-073, dated May 13, 2014 ("DOD OIG Report"), was entitled "Northrop Grumman Improperly Charged Labor for the Counter Narco-terrorism Technology Program," even though all the questioned costs in the amount of $123.1 million related to invoices that DynCorp had submitted to Northrop Grumman. The DOD OIG Report led to considerable adverse public attention and negative press reports regarding Northrop Grumman based on questions regarding DynCorp's labor mapping and billing practices.

34. After the DOD OIG's audit report, Northrop Grumman continued to seek to hold DynCorp to its contractual obligation to provide records to verify the labor charges in its invoices, and DynCorp continued to fail to honor its contractual obligations. Indeed, Northrop Grumman made numerous requests, including but not limited to the requests described herein.

35. In May 2014, Northrop Grumman paid approximately $5 million to DynCorp on invoices submitted by DynCorp under the Subcontract. DynCorp's refusal to provide the requested documentation has prevented Northrop Grumman from invoicing the government for those charges because, without that documentation, Northrop Grumman has been unable to certify to the Government that those charges are appropriate and accurate.

36. On June 13, 2014, Northrop Grumman, through its Deputy General Counsel, informed DynCorp in writing (attached as Exhibit 1) that it was troubled by the DOD OIG Report's finding that "DynCorp knowingly applied incorrect labor rates" in its invoices submitted to Northrop Grumman. Northrop Grumman asked DynCorp promptly to provide

9

detailed assurances that DynCorp had satisfied its contractual obligations. DynCorp failed to provide Northrop Grumman the requested documents and information.

37. On July 31, 2014, Northrop Grumman, through its Deputy General Counsel, reminded DynCorp in writing (attached as Exhibit 2) that the terms of the Subcontract required DynCorp to produce records so Northrop Grumman could verify that DynCorp had satisfied its contractual obligations with respect to the propriety of labor charges submitted in invoices. Northrop Grumman again requested documents and other information so it could conduct this analysis. DynCorp once again failed to provide Northrop Grumman the requested documents and information.

38. On August 13, 2014, the United States District Court for the Eastern District of Virginia issued an order lifting the seal on *United States ex rel. Hollis and Egan v. DynCorp International, Inc.*, Case No. 1:13cv698 (GBL/TRJ). Soon thereafter, Northrop Grumman became aware of the allegations in that case asserting that DynCorp had violated the False Claims Act by submitting improper invoices to Northrop Grumman under the Subcontract. In addition, the complaint alleged that DynCorp took actions to conceal its improper labor mapping from Northrop Grumman. These allegations still further increased Northrop Grumman's concern about DynCorp's billing practices as well as the need to obtain the documents and other information related to DynCorp's invoices so that Northrop Grumman could address these issues and help to ensure that its government customer was well served.

39. On August 22, 2014, Northrop Grumman, through its Deputy General Counsel, again reminded DynCorp in writing (attached as Exhibit 3) that the Subcontract obligates DynCorp to provide Northrop Grumman records relating to DynCorp's work upon request and that, without receiving and reviewing the requested materials, Northrop Grumman could not

adequately confirm that DynCorp had complied with the invoicing terms of the Subcontract. DynCorp again failed to meet its obligation under the Subcontract to provide Northrop Grumman with the requested documents and information.

40. On October 14, 2014, Northrop Grumman, through its Subcontracts Administrator, once again reminded DynCorp in writing (attached as Exhibit 4) that the Subcontract gives Northrop Grumman the right to audit DynCorp's documents so it could verify the accuracy of DynCorp's invoices and DynCorp's compliance with the Subcontract. Northrop Grumman also informed DynCorp "that unless and until DynCorp has provided all necessary documentation to verify the accuracy and compliance of DynCorp's historical and present labor mapping and invoices, we shall not make any additional payments because we are unable to assess the proper amounts due." DynCorp continued to fail to provide Northrop Grumman with the requested documents and information.

41. The documents sought by Northrop Grumman, as reflected in this correspondence and in letters exchanged by outside counsel to Northrop Grumman and DynCorp, included the following:

- Complete and accurate CNTPO labor category description resume templates for all DynCorp personnel who are or have been assigned to the CNTPO program, including copies of approximately 400 resumes that DynCorp previously provided to the Government but refused to share with Northrop Grumman;
- Copies of licenses and certifications required by the CNTPO labor category descriptions and task order Performance Work Statements for all personnel who are or have performed under the Subcontract in labor categories that require license and/or certifications;

11

- A list of all DynCorp employees who did not meet or have not met all of the qualifications of the CNTPO labor categories into which they were assigned and explanations for those assignment decisions; and

- A list of invoiced employee hours exceeding 8 hours per day and explanations for the hours worked.

42. Additionally, Northrop Grumman requested that DynCorp reassign certain personnel to appropriate labor categories in the event those employees did not satisfy the requirements for the labor categories to which they had previously been assigned.

43. The foregoing information was set forth in, among other places, an October 21, 2014 letter (attached as Exhibit 5) from Northrop Grumman's outside counsel to DynCorp's outside counsel. That letter further reiterated that "Northrop Grumman cannot process DynCorp invoices without the information previously requested that is necessary for Northrop Grumman to evaluate the appropriateness of the charges in any pending and prior invoices."

44. On November 14, 2014, Northrop Grumman, through its Subcontracts Administrator, once again reiterated in writing (attached as Exhibit 6) its previous requests for documents and a remapping of any DynCorp personnel who did not meet the labor category requirements. Northrop Grumman again explained to DynCorp that it could not make payment on or bill the Government for any pending or future DynCorp invoices without first receiving and reviewing the documentation necessary to verify the accuracy of DynCorp's labor charges. The letter also reminded DynCorp that Northrop Grumman "continues to reserve its rights to set off from amounts otherwise due for any prior overpayments," as well as its rights, among others, to indemnification and reimbursement from DynCorp.

45. On November 20, 2014, Northrop Grumman, through its Subcontracts Administrator, informed DynCorp in writing (attached as Exhibit 7) that Northrop Grumman could not agree to the unreasonable conditions DynCorp sought to impose on its reported willingness to fulfill certain obligations under the Subcontract. Northrop Grumman reiterated the position set forth in prior correspondence, including that "Northrop Grumman, as a responsible contactor, has a duty to take reasonable steps to ensure that all costs included on invoices to the Government are accurate, consistent with the contract, and reflect actual amounts due." Northrop Grumman reiterated its request for substantiation of DynCorp's labor charges. Northrop Grumman informed DynCorp that it would have no alternative but to reject labor portions on pending invoices absent adequate substantiation for those proposed charges.

46. On November 26, 2014, Northrop Grumman, through its Subcontracts Administrator, informed DynCorp in writing (attached as Exhibit 8) that, because DynCorp had refused to substantiate its invoices in accordance with the Subcontract's terms, Northrop Grumman had no alternative but to reject the labor portion of all pending DynCorp invoices.

47. Northrop Grumman has ceased making payments to DynCorp as a result of DynCorp's continuing breach of the Subcontract and refusal to provide supporting documentation. Because of DynCorp's breach, Northrop Grumman has been unable to ensure that DynCorp's invoices were proper and not overstated, and has been put in the untenable position of not being able to invoice the Government for DynCorp's charges. As a result, Northrop Grumman has been unable to invoice the Government for approximately $5 million in charges already paid to DynCorp, and may have to set off and recover additional amounts if it is found that DynCorp has overcharged Northrop Grumman. DynCorp has taken the position that

it is not obligated to reimburse Northrop Grumman for amounts that may be owed to the Government.

48. On December 10, 2014, Northrop Grumman, through its Subcontracts Administrator, informed DynCorp in writing (attached as Exhibit 9) that Northrop Grumman was prepared, as stated in Northrop Grumman's prior correspondence, to assess and make payment on any amounts properly due to DynCorp once it received the requested documents and information verifying DynCorp's labor charges.

49. On December 16, 2014, the United States District Court for the Eastern District of Virginia issued an order dismissing the False Claims Act *qui tam* complaint in *United States ex rel. Hollis and Egan v. DynCorp International, Inc.* This dismissal was without prejudice; it did not address Northrop Grumman's concerns about DynCorp's invoicing practices or Northrop Grumman's need to obtain supporting documents and information.

50. DynCorp continues to be in breach of its obligations under the Subcontract by refusing to provide resumes, information about employee qualifications, explanations for labor mapping of employees who do not meet the labor category descriptions and for excessive hours, and other records repeatedly requested by Northrop Grumman to verify the accuracy, propriety, and contractual compliance of the current and previous labor charges invoiced by DynCorp to Northrop Grumman.

51. Northrop Grumman has incurred and will continue to incur significant attorney's fees and related costs in bringing this case to secure the equitable remedy of specific performance.

52. Since May 19, 2014, Northrop Grumman has been unable to invoice the Government for charges submitted by DynCorp because, without the supporting documents and

information that it has repeatedly requested, and in light of the concerns raised by the DOD OIG report and the complaint in *United States ex rel. Hollis and Egan v. DynCorp International, Inc.*. Northrop Grumman has been unable to certify that the labor charges included in DynCorp's invoices are accurate and proper. As a result, Northrop Grumman has paid DynCorp approximately $5 million in invoices that Northrop Grumman cannot bill to the Government because Northrop Grumman is unable adequately to ensure that DynCorp's invoices are accurate.

53. Plaintiff filed the original complaint in this case on March 13, 2015. DynCorp continues to assert that it has no obligation under the Subcontract to provide the documents Northrop Grumman has been requesting for over two years. As part of its response to discovery requests served by Northrop Grumman, DynCorp produced approximately 400 resumes of DynCorp employees on May 28, 2015. DynCorp's production is incomplete in several respects, including that it does not encompass some personnel who worked after March 2013, and for whom DynCorp has billed since that date. Ultimately, these resumes represent a woefully inadequate subset of the documents that Northrop Grumman has a contractual right to receive and inspect to substantiate DynCorp's invoices under the Subcontract.

**CAUSES OF ACTION**

COUNT I – SPECIFIC PERFORMANCE

54. Plaintiff realleges paragraphs 1 through 53 above and incorporates them as paragraph 54 of Count I.

55. DynCorp has failed to comply with Articles VIII.A.2(a)(1) and XIV.H.5 and Clause 34.b of the Subcontract to maintain records in support of its invoices and to provide those records when requested by Northrop Grumman.

15

56. Northrop Grumman requires the supporting documentation within DynCorp's control underlying each labor charge to ensure the accuracy of those labor charges.

57. Northrop Grumman does not have an adequate remedy at law, as the injury that Northrop Grumman has suffered is not fully compensable by monetary damages. DynCorp's failure to supply the requested records has harmed Northrop Grumman's relationship with its primary customer, the Department of Defense, and has harmed its reputation through negative media coverage.

58. The DOD OIG report and the complaint in *United States ex rel. Hollis and Egan v. DynCorp International, Inc.* raise further concerns that DynCorp has submitted improper or even fraudulent labor charges to Northrop Grumman under the Subcontract. Northrop Grumman requires the documents that DynCorp is contractually obligated to provide in order for Northrop Grumman to address those concerns.

59. Upon information and belief, DynCorp will not face undue burdens or great practical difficulties if ordered to provide these documents to Northrop Grumman pursuant to the Subcontract.

60. Northrop Grumman seeks an Order compelling DynCorp promptly to provide the requested records to substantiate its invoices to Northrop Grumman and awarding Northrop Grumman its attorney's fees and costs incurred in seeking and obtaining this equitable remedy. Northrop Grumman is entitled to recover attorney's fees and related costs incurred in securing the equitable remedy of specific performance.

## COUNT II – BREACH OF CONTRACT FOR REFUSAL TO PRODUCE AND MAINTAIN RECORDS

61. Plaintiff realleges paragraphs 1 through 53 above and incorporates them as paragraph 61 of Count II.