Exhibit 13



VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

NORTHROP GRUMMAN TECHNICAL )
SERVICES, INC., )
    Plaintiff, )
            v. ) CL No. 2015-3427
DYNCORP INTERNATIONAL LLC, )
    Defendant. )

## COUNTERCLAIM

Defendant DynCorp International LLC ("DI"), by counsel, files this Counterclaim against Northrop Grumman Technical Services, Inc. ("Northrop") and alleges as follows:

### NATURE OF THE CLAIM

1. Northrop wrongly refuses to pay no less than $40,520,894.78 owed to DI for performing *as understood and directed by Northrop* under a government contract in Afghanistan. Specifically, Northrop seeks to renege on its directions to and understandings with DI about how to categorize and invoice for services ("labor mapping") of DI employees, who dutifully provided services and other support under Northrop's prime contract with the Department of Defense ("DOD") Counter Narcotics Terrorism Program Office ("CNTPO"), an organization established to provide global detection, monitoring, and disruption of narco-terrorist activities in Afghanistan, among other places.

2. Over a seven-year period, DI employees completed the services and support requested by Northrop, and the Government (through its CNTPO Contracting

Officer) determined that it had received "the intended quality and skills of personnel" for the work performed by DI. Although DI has invoiced Northrop in accordance with the parties' agreement and course of conduct from 2007 through 2014, and Northrop paid DI in accordance with that practice for seven years, Northrop has refused to pay DI for more than $40 million worth of services it performed.

3. Despite Northrop's specific direction to DI about labor mapping, Northrop unilaterally changed course when it was named in a May 2014 DOD Office of the Inspector General ("IG") report entitled "Northrop Grumman Improperly Charged Labor for the Counter Narco-terrorism Technology Program." Upon information and belief, after the Department of Justice ("DOJ") questioned the Contracting Officer, the DOJ declined to intervene in a False Claims Act case involving these same allegations. Rather than challenge the DOD IG report's findings or acknowledge Northrop's own responsibility for the labor mapping addressed by that report, Northrop decided to blame DI. Northrop is fully aware that it previously represented to DI that its instructions on labor mapping had been approved by the CNTPO Contracting Officer, so the only rational explanation for Northrop's conduct is that Northrop now understands, as the prime contractor, it has the privity of contract with the Government, it is responsible for compliance with the CNTPO prime contract, and it created the terms and conditions of performance that do not easily fit into the prime contract.

4. Even if Northrop now regrets its instructions to DI regarding the labor mapping of DI employees, that is no basis to refuse payment to DI for those services. Any liability Northrop may have to the Government for such instructions should not be

2

foisted upon DI because of Northrop's revisionist history, its withholding of millions of dollars due to DI for services rendered, and its public lawsuit.

5. But Northrop did not stop there. As a part of its apparent plan to improperly pressure its smaller subcontractor, among the invoiced amounts that Northrop has refused to pay DI are certain materials, subcontractors, travel and other direct costs of more than $13.6 million. Moreover, Northrop induced DI to negotiate in good faith and to continue to provide services, while Northrop only purported to act in good faith as it was actually preparing a lawsuit designed to produce further services and extra-contractual documentation from DI without compensation.

6. Since 2007, DI has provided the qualified personnel critical to the logistics, maintenance, and training requirements of CNTPO's counter narcoterrorism ("CNT") missions, and indeed, the Government still relies on DI personnel for these support services in Afghanistan.

7. From the outset of the parties' relationship, Northrop acknowledged that the labor categories in the CNTPO prime contract did not match the labor categories actually necessary for the tasks which it hired DI to perform in a wartime, contingency environment. DI trusted and relied on Northrop—the prime contractor with direct access to the Government customer—when Northrop directed DI to map its personnel to labor categories as best it could to achieve the mission, notwithstanding the labor category mismatch of which Northrop was fully aware (as discussed below). DI trusted Northrop when it accepted and paid DI's invoices over the first several years, and DI trusted Northrop when it represented to DI that Northrop had obtained a formalized and documented waiver of the requirements from the Government. Thus, for years, DI's

personnel were assigned to certain labor categories for billing purposes that were *disclosed to and approved by Northrop and the Government.*

8. Now, after nearly seven (7) years of cooperation and agreement, Northrop has abruptly reversed course and attempted to rewrite the rules of the program. Northrop does not deny that DI is entitled to payment for its services, yet Northrop is conditioning payment on its demand for records and other information never before contemplated or required. In a good faith effort not to jeopardize the CNTPO's mission in Afghanistan, DI continued to dutifully serve through the end of the work in 2014, even though Northrop was at that time *unlawfully withholding all compensation to DI*.

9. Prior to the filing of this Counterclaim, DI approached Northrop about payment of the large sums owed to DI, but Northrop refused to engage in such discussions unless DI succumbed to Northrop's unjustified demands. DI now has no choice but to seek an award of damages for Northrop's breach of its obligations to pay and its duty of good faith and fair dealing. In the alternative, DI seeks an order from this Court awarding DI the reasonable value of the essential services and other support it provided.

### PARTIES

10. DI is a Delaware limited liability company with its principal place of business in Virginia.

11. Upon information and belief, Northrop is an Oklahoma corporation with its principal place of business in Virginia.

### JURISDICTION AND VENUE

12. Venue is proper in this Court pursuant to Va. Code Ann. § 8.01-262. DI's

principal place of business is located in Fairfax County, Virginia.

13. This Court has jurisdiction over Northrop because Northrop regularly conducts business activities in the Commonwealth of Virginia. All other jurisdictional prerequisites have been met.

## FACTUAL BACKGROUND

### THE SUBCONTRACT

14. On or about August 24, 2007, the U.S. Army Space and Missile Defense Command awarded Contract Number W9113M-07-D-0007 (the "Prime Contract"), an indefinite delivery, indefinite quantity ("IDIQ") contract[1] to provide support to the CNTPO, to Northrop Grumman Space and Mission Systems Corporation. Northrop Grumman Space and Mission Systems Corporation competed with four other prime contractors for task orders.

15. On or about October 1, 2007, Northrop and DI entered into Subcontract Number GCNGC-07-039, an IDIQ subcontract (the "Subcontract") to support the Prime Contract. Through task orders and associated purchase orders under the Subcontract, Northrop sought DI's support in the form of "the necessary goods and services required by the DOD CNTPO to support the [CNT] mission of the Department of Defense, other Federal agencies, partner nations and State and local authorities."

16. As the prime contractor, Northrop was responsible for compliance with the CNTPO Prime Contract. Because DI did not have privity of contract with the Government, DI was not expected or allowed to work directly with the Government customer without Northrop's express authorization.

---

[1] An IDIQ contract provides for an indefinite quantity of supplies or services over a fixed period of time and serves as a basic contract against which the Government can place task orders for specific services such as those at issue here.

5

17. Northrop awarded six Task Orders under the Subcontract to DI: 3, 6, 10, 15, 20, and 21. Each of the Task Orders referred to the Subcontract for all terms and conditions. The Subcontract and Task Orders thus provided that DI would be compensated for "Direct Labor" by hourly rate, and separately for "Materials, Subcontracts, Travel and Other Direct Costs," including subcontractor labor (collectively, "ODCs").

18. DI generally provided spare parts and equipment, maintenance, logistics support, and training for Afghanistan government organizations. Task Order 20, which specifically involved flight operations, training, maintenance and logistics support for Russian-made Mi-17 helicopters used by the Afghanistan Air Force and Afghanistan Ministry of Interior Special Mission Wing, is the largest Task Order, and has accounted for more than 90% of DI's labor hours and charges.

**TREATMENT OF LABOR CATEGORIES FROM SUBCONTRACT INCEPTION**

19. Both the Government and Northrop acknowledged from the outset of performance of the Subcontract's Task Orders that the CNTPO labor categories and fixed hourly labor rates did not align with the specialized aviation support mission work required under DI's Task Orders Performance Work Statements, and also did not align with the qualifications required of the individuals who would actually be needed to perform the work.

20. When DI raised concerns about this mismatch, Northrop – the prime contractor responsible for compliance with the Prime Contract and the only party authorized to communicate directly with the Government – acknowledged that the CNTPO labor categories were not appropriate. Northrop advised DI that the Government

had dictated that no new positions could be added to the CNTPO labor categories, and that DI should assign (or "map") each of its employees "somewhere somehow" into the CNTPO labor categories list. DI, trusting that Northrop would ensure compliance with the Prime Contract, did as Northrop directed.

21. Consistent with Northrop's direction, and with Northrop's full knowledge and approval, DI began mapping its employees to the CNTPO labor categories with the best functional fit with a corresponding market rate sufficient to recruit and retain the necessary employees in a high-risk, combat environment.

22. DI submitted "crosswalks" to Northrop identifying a DI employee's title/position and the CNTPO labor category to which the employee had been mapped. DI also submitted manning charts to Northrop during performance with the same information. Northrop has not been forthcoming about how these crosswalks were used, but upon information and belief, Northrop shared these crosswalks and manning charts with the Government, such that DI's labor mapping was transparent to Northrop and the Government.

23. Beginning in 2012, DI's proposals to Northrop under the Subcontract included the following qualifying language to reflect how it had adhered to Northrop's waiver and complied with its direction to make the existing labor categories work: "Our proposal assumes a continued waiver of CNTPO subcontract labor category qualifications for all incumbent personnel who have been proposed to perform on this option. Any new staff that is brought on board after award of this option will meet the CNTPO subcontract labor categories to the extent they can be mapped to labor categories and attendant rates that reflect the type of position required for Task performance. For

any new staff that cannot be so mapped, DI will select rates that are the most relevant for recruiting and retaining the types of personnel required for performance, notwithstanding the qualification requirements of a particular labor category."

24. When requested to do so by Northrop on a limited number of occasions in 2012, 2013 and 2014, DI also submitted task order proposals with proprietary cost information (*i.e.*, "fully disclosed" proposals) directly to the CNTPO Contracting Officer. These fully disclosed proposals included crosswalks identifying the DI employee's title/position, CNTPO labor category, direct hourly labor rate, fully burdened cost, and fee. DI was comfortable providing this information to the Government because it understood that Northrop had worked with the Government to secure a waiver of the strict application of the labor category requirements.

25. In mid-2013, Northrop advised DI that it had decided to formally document and ratify the course of conduct between the parties in a written waiver of the qualifications and duties of the CNTPO labor categories with the Contracting Officer. Northrop thus requested, and DI made available, resumes for more than 250 DI employees engaged in CNTPO work and a matrix which identified their DI "Job Title," the "CNTPO Labor Category" into which they were mapped, and information related to their experience and qualifications for the mapped position.

26. When DI specifically asked to participate in Northrop's meeting with the Contracting Officer at which the final matrix was presented, Northrop exercised its discretion as the prime contractor to decline DI's request, and refused to allow DI to participate. After the meeting, Northrop reported to DI that the Contracting Officer formally documented and ratified the course of conduct in a written "waiver." Although

Northrop declined to provide a copy of the waiver to DI, Northrop assured DI in writing that the Contracting Officer had signed a written waiver.

27.  On August 26, 2013, Northrop's CNTPO Contract Director sent DI a memorandum (the "August 26, 2013 Memorandum") regarding "the written agreement between AMCOM Contracting Officer and Northrop Grumman . . . relative to [Task Order 20] CNTPO Labor Category Waivers":

> The USG Contracting Officer reviewed the labor category matrices provided by Northrop Grumman on behalf of our subcontract, [DI] in support of their Firm Fixed Price/Level of Effort Proposal for the period ending 30 September 2013.
>
> As a result of this review, the USG Contracting Officer provided written acknowledgment and confirmation to Northrop Grumman that they agreed that the CNTPO labor categories do not align with the activities to be performed on [Task Order 20], nor do they necessarily align with the qualifications required of the individuals performing on this [Task Order.] The Contracting Officer for [Task Order 20] also acknowledged that they reviewed the proposed staffing assignments in the proposed matrix. To date, the Contracting Officer has not requested the resumes; but has advised Northrop that they will contact us if they desire copies. Northrop Grumman received the Contracting Officer's concurrence that they understood that individuals billing to particular CNTPO Labor Categories may not meet the explicit qualifications in that CNTPO labor category; however, for the purpose of performing this effort, the USG Contracting Officer determined that the Government is receiving the intended quality and skills of personnel to complete [Task Order 20] requirements.
>
> Per my conversation with [DI] on 22 August 2013, for future proposals and for any changes to staff which will require a waiver, [DI]is required to provide an updated personnel Matrix and the updated resume which will allow Northrop Grumman to forward to the Contracting officer for written acknowledgment and concurrence. This information should be provided with all submitted proposals for the duration of [Task Order 20].

DI trusted that Northrop, as the prime contractor, accurately portrayed the understanding between the Government and Northrop, and relied on these representations going forward.

28. Northrop created a standardized Qualifications Summary Form ("QSF") process to approve labor category assignments for DI employees hired after the Contracting Officer formally documented and ratified the course of conduct by a written waiver in August 2013, as well as any employees inadvertently omitted from the matrix reviewed by the Contracting Officer in August 2013. Northrop created the QSF template, and DI followed Northrop's direction by filling out the template to identify the employee's DI job title, proposed CNTPO labor category, and a summary of the employee's relevant qualifications and experience for the mapped category.

29. As part of the QSF process, Northrop acknowledged that DI employees would not need to meet the CNTPO Prime Contract qualification requirements if they were not necessary for an employee's actual work under the Performance Work Statement. The QSF process resulted in Northrop's specific approval of the mapping of approximately 100 additional DI employees beyond those individually covered by the written August 2013 waiver.

30. Throughout performance, and with full knowledge and approval of the Government and Northrop, DI selected labor categories for its workforce according to those categories most closely aligned to the actual work required and to the market rates required to attract and retain a qualified workforce.

DI PERFORMED THE MISSION IN A CHALLENGING ENVIRONMENT

31. When DI began performing in October 2007, conditions in Afghanistan were austere and challenging. Despite this challenging environment, as the Contracting Officer stated, DI delivered "the intended quality and skills of personnel to complete [Task Order 20] requirements." August 26, 2013 Memorandum.

32. In this manner, DI provided hundreds of thousands of hours of service from more than 700 employees over a seven-year period.

**NORTHROP REVERSES ITS POSITION AND REFUSES TO PAY DI**

33. In June 2013, auditors with the DOD IG advised DI that they were reviewing labor charges under the CNTPO Contract. DI cooperated with the auditors' requests for resumes and invoicing details, and met with the auditors to explain the labor mapping practices that had been approved by both Northrop and the Government.

34. In May 2014, the DOD IG issued Report Number DODIG-2014-073 regarding Northrop's billing under the Contract. The DOD IG Report summarized the auditors findings as follows:

> For nearly 6 years, Northrop Grumman did not properly charge labor rates for the Counter Narco-terrorism Technology Program. Specifically, Northrop Grumman submitted labor charges performed by 360 of 460 [DI] employees [] that did not meet the qualifications specified in the contract. Northrop Grumman officials submitted labor charges for an additional 33 [DI] employees that may not have met the qualifications specified in the contract.

The report did not reflect, or even mention, the parties' agreements, communications, and course of conduct regarding labor mapping under the Contract, including the Government's August 2013 waiver.

35. The Subcontract requires Northrop to pay DI "promptly after receipt of substantiated invoices or vouchers approved by [Northrop's] Subcontract Manager," and incorporates Federal Acquisition Regulation 52.232-25, which requires Northrop to review DI's invoices and, if it wishes to reject them for lack of information, to do so within 10 days. The same clause requires Northrop to pay DI within 33 days after receipt of an invoice.

36. In July 2014, Northrop stopped paying DI's invoices under the Subcontract's Task Orders. Northrop did so in apparent reaction to the DOD IG's report, even though Northrop knew that the report did not fully investigate or accurately portray the circumstances of the Prime Contract and Subcontract, including the parties' communications and agreements about the CNTPO labor categories, as well as the Government's waiver. And Northrop did so without claiming that DI was not entitled to reimbursement for those services.

37. Northrop advised DI that, shortly after the release of the DOD IG report, the Contracting Officer attempted to revoke his written waiver of the labor category requirements. But Northrop continued to provide DI with only limited information about its communications with the Government.

38. In a position inconsistent with the course of conduct between the parties (including Northrop's earlier acknowledgment that the Subcontract it created for DI did not match the labor categories actually necessary for the tasks which it hired DI to perform, Northrop's earlier direction to DI regarding CNTPO labor categories, its earlier representation to DI confirming an explicit waiver of CNTPO labor requirements, and the parties' process for reviewing and approving DI's CNTPO labor category mapping), Northrop began demanding that DI provide voluminous records related to its invoices under all of the Subcontract's Task Orders. Some of these records had already been provided, some were never required previously, and some were those which Northrop had no right to demand, under the Subcontract or otherwise. Northrop, while continuing to withhold compensation to DI (including payment of DI's ODCs), also began demanding that DI reassign/remap its workforce as dictated by Northrop, including

12

retroactively. DI objected to these requests, but so as not to interfere with the mission, DI continued to perform and continued to meet the Government's and Northrop's mission requirements even though Northrop had stopped paying DI for its work.

39. Specifically, on July 31, 2014, Northrop demanded that DI provide 18 separate categories of documents to Northrop as a condition of Northrop's review and approval of DI's invoices. Although DI agreed to produce the documents that documented the history of the dealings between the parties on the CNTPO labor categories, much of the information requested was not required under the Subcontract and had never before been produced in the ordinary course of proposal preparation, performance, or invoice submission and payment under the Subcontract.

40. In August 2014, Northrop demanded copies of mechanic licenses and certifications for DI employees in CNTPO "air worthiness" labor categories, even if they were specifically covered by the waiver confirmed and documented in August 2013, or their individual mapping had been approved by Northrop through the QSF process.

41. On September 18, 2014, DI attended a meeting with senior representatives from Northrop scheduled to discuss and resolve Northrop's new, unexplained concerns about labor mapping done consistent with its direction and the QSF process.

42. Days later, Northrop directed DI to "remap" more than 50 employees already mapped and approved by Northrop and the Contracting Officer under the QSF process. DI was surprised because Northrop had given no indication that it would direct remapping at the September 18 meeting. DI was also surprised because, without any contractual basis, Northrop improperly conditioned payment of DI's invoices on DI's agreement to this burdensome process, demanding that DI agree to the remapping and

provide additional information about each of the dozens of identified employees within three days. As DI objected at the time, the burden was entirely unjustified because invoices using the mapping dictated during the QSF process were previously submitted, approved, and paid for these employees. DI was not required, and did not agree, to remap its employees in a manner inconsistent with the Government's waiver and Northrop's QSF process. DI advised that, although it had always previously respected Northrop's refusal to allow direct contact between DI and the Government, it wished to begin communicating with the Government directly about the matter to ensure that performance could continue.

43. On October 14, 2014, Northrop responded, again demanding that DI comply with Northrop's attempt to revisit settled labor mapping. Northrop recognized that its new requests were radically different from the parties' previous course of conduct, stating that the "landscape under which the parties are operating" had changed and claiming that it was now (for the first time) conducting a "robust" and "thorough review" of labor mapping. Northrop did not acknowledge the QSF process it had devised, and attempted to override the course of conduct between Northrop and DI by asserting that the Government had recently indicated that the waiver formalized and documented in August 2013 "had limited applicability, both in terms of timeframe and scope, and is no longer effective." Northrop still, however, refused to provide its consent to allow DI to contact the Government directly.

44. On November 26, 2014, Northrop informed DI that it had decided to "reject the labor portion of all pending [DI] invoices" and place invoices submitted for ODCs "in a suspense status."

14

45. Through the end of 2014, DI continued in good faith to perform the mission for the Government and accrued approximately $150,000 in Direct Labor costs every day, without payment by Northrop.

### MEANWHILE, THE PARTIES' INTERACTIONS SURROUNDING THE EXTENSION AND RECOMPETITION OF THE CNTPO CONTRACT CONFIRMED DI WAS A VALUED PARTNER

46. On November 6, 2014, in the midst of its demands for more information from DI, its transmission of letters alleging that DI had not complied with its obligations, and its failure to pay DI millions of dollars, Northrop asked DI to continue to work as its partner on the program. Northrop notified DI that the Government had requested a proposal for a two-month extension to the task order. Northrop asked DI to commit to supporting Northrop under the extension. Northrop once again acknowledged that DI had previously performed with personnel who were subject to the Government's waiver of the labor qualifications, and demanded that DI remap its personnel because the Government had now advised Northrop that it would no longer honor the waiver.

47. On November 14, 2014, Northrop requested a formal proposal from DI. Committed to the Government's mission, DI stated that it would support the task order extension as long as Northrop agreed to a few reasonable conditions.

48. Although DI continued to disagree that remapping was required, DI agreed to remap personnel for future performance if Northrop would provide written notice that the Government approved of the remapping, and if Northrop paid DI's outstanding invoices for ODCs and Direct Labor approved by the waiver or the QSF process. Northrop would not agree to this reasonable proposal, and still refused to pay DI for work performed or commit to paying DI in the future if it conformed to the remapping

15