IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

NORHTROP GRUMMAN TECHNICAL      )
SERVICES, INC.,                 )
                                )
      Plaintiff,                )
                                )
          v.                    )      1:16cv534(JCC/IDD)
                                )
DYNCORP INTERNATIONAL LLC,      )
                                )
      Defendant.                )

## M E M O R A N D U M   O P I N I O N

     This matter is before the Court on Defendant DynCorp International LLC's ("Defendant", or "DynCorp") Motion to Remand.  [Dkt. 13.]  The Court granted the motion June 2, 2016.  This Memorandum Opinion explains the Court's basis for that decision.

### I. Background

     This case is a contract dispute between Plaintiff Northrop Grumman Technical Services, Inc. ("Plaintiff" or "Northrop Grumman") and DynCorp.  This case began its life on March 13, 2015, in Circuit Court for Fairfax County, where Northrop Grumman filed a suit seeking specific performance from DynCorp requiring DynCorp to produce documentation relating to invoices for labor charges under a subcontract between the parties as well as damages for breach of that contract.  (Compl.

1

[Dkt. 1-1], ¶ 1.) On May 12, 2016, Northrop Grumman removed the case from the Circuit Court for Fairfax County to this Court pursuant to 28 U.S.C. § 1442. (Notice of Removal [Dkt. 1].) Some discussion of the factual background underlying Northrop Grumman and DynCorp's relationship is necessary.

On August 24, 2007, Northrop Grumman entered into a contract with the U.S. Army Space and Missile Defense Command, acting on behalf of the Counter Narco-Terrorism Technology Program Office, to provide support to counter-narcotics operations in Afghanistan ("the Prime Contract"). (*Id.* at ¶¶ 1, 10.) Also in 2007, Northrop Grumman entered into a subcontract with DynCorp to supply personnel to assist Northrop Grumman and the Army with various aspects of the Prime Contract under six Task Orders ("the Subcontract"). (*Id.* at ¶ 12.) Northrop Grumman asserts that under the Subcontract, "DynCorp's employees had to be adequately qualified and assigned to appropriate labor categories." (*Id.* at ¶ 2.) The Subcontract provides, at Clause 23, that although DynCorp is a subcontractor, it still must proceed through the dispute resolution process set forth in the Contract Disputes Act ("CDA") to challenge Government decisions regarding the contract if it "disagrees with any such decision made by the Government." (Pl.'s Sealed Ex. A to Seybold Decl. [Dkt. 5-1] at 21 (Subcontract Clause No. 23).) The CDA establishes a complex regulatory scheme for resolution of

2

disputes between government contractors and the Government arising from the contracts between them. *See* Contract Disputes Act of 1978, 41 U.S.C.A. §§ 7101-7909.

Under the Subcontract, DynCorp submitted cost proposals to Northrop Grumman setting forth the price of the work it would perform to accomplish a given Task Order. (Notice of Removal, ¶ 15.) DynCorp formulated this price by assigning the work each DynCorp employee would accomplish to a labor category established by the Prime Contract and then using the associated billing rate. (*Id.*) Northrop Grumman then took the information in DynCorp's proposals to the Army for approval. (*Id.*) Once DynCorp began actually performing a Task Order, it invoiced for services performed by its personnel by submitting invoices containing the hours worked by each employee, that employee's assigned labor category, and the hourly rate for that employee. (*Id.* at ¶ 16.) At some point DynCorp realized, and informed Northrop Grumman, that the approved labor categories under the Prime Contract did not match the kind of labor that was actually necessary for DynCorp to satisfactorily perform its Task Orders under the Subcontract. (*Id.*)

In September 2007, at the outset of the Prime Contract, the Government instructed Northrop Grumman and its subcontractors to "find a way to fit the work . . . under the existing labor categories." (Notice of Removal, Ex. C at 61.)

3

DynCorp asserts that Northrop Grumman told DynCorp to simply find a way to fit its employees into the existing labor categories "somewhere somehow" even if it was not a natural fit, and that Northrop Grumman represented that this direction was coming from the Government. (*Id.* at ¶ 18.)  DynCorp asserts that it routinely provided "crosswalks" to Northrop Grumman showing how DynCorp was assigning its personnel to mismatching labor categories in an attempt to make them fit. (Def.'s Mem. at 3.)  At some point, the Government began investigating whether or not Northrop Grumman and DynCorp were properly assigning or "mapping" its employees to the labor categories established in the Prime Contract, and whether the billing rates were excessive. *(*Notice of Removal, ¶ 3.)  In 2013, with that investigation underway, Northrop Grumman sought guidance from the Government on how its employees and DynCorp's employees should be mapped to labor categories. (*Id.* at ¶ 19.)

In August 2013, the Government's Contracting Officer assigned to the Prime Contract issued a memorandum indicating that the Government would waive the requirement of labor category qualifications for a list of specific Northrop Grumman and DynCorp employees. (*Id.*)  Northrop Grumman relayed this direction to DynCorp on August 26, 2013. (*Id.*)  In May 2014, the Depart of Defense, Office of the Inspector General ("DODIG") issued an unfavorable report on the billing rates and practices

associated with the underlying government project.  (*Id.* at ¶ 2.)  On June 16, 2014, the Government informed Northrop Grumman that it was rescinding the August 2013 waiver memorandum, and that subsequent labor category waivers would have to be approved by the Contracting Officer.  (*Id.* at ¶ 20.)

In light of these developments, Northrop Grumman demanded substantiating documents and information from DynCorp to determine whether DynCorp's billing was in line with the Subcontract and guidance from the Government.  (*Id.* at ¶¶ 3, 21.)  After DynCorp was not forthcoming with this documentation, Northrop Grumman stopped submitting DynCorp's invoices to the Government and informed DynCorp on November 26, 2014, that Northrop Grumman would "reject the labor portion of all pending DynCorp invoices and place invoices for other direct costs in suspense."  (*Id.* at ¶ 20)

Eventually, on March 13, 2015, Northrop Grumman filed the initial claim in this lawsuit in Fairfax County Circuit Court, alleging that DynCorp had a contractual duty to maintain such documents and turn them over to Northrop Grumman upon request, and seeking specific performance of those duties.  (*Id.* at ¶ 4.)  Northrop Grumman also sought breach of contract damages against DynCorp in its initial complaint.  (*Id.*)  Northrop Grumman filed an Amended Complaint asserting the same claims on June 29, 2015.  (*Id.*)  In June of 2015, DynCorp

demurred to Northrop Grumman's complaint in State court, and three of Northrop Grumman's four claims were dismissed. (Def.'s Mem. in Supp. [Dkt. 17] at 6.)  On September 11, 2015, DynCorp filed counterclaims for breach of contract, breach of duty of good faith and fair dealing, and unjust enrichment seeking $40,520,89.78 allegedly owed to DynCorp by Northrop Grumman. (Counterclaim [Dkt. 1-17, 1-18].)  On October 9, 2015, Northrop Grumman demurred to DynCorp's counterclaims in State court, which was then argued and resolved by that Court resulting in the demurrer being overruled as to all of the claims. (Def.'s Mem. in Supp. at 6.)  On April 1, 2016, Northrop Grumman filed a motion for summary judgment on Count IV of DynCorp's amended counterclaim. (Def.'s Ex. 25. [Dkt. 54-2].)  On April 22, 2016, Northrop Grumman filed a claim for contract interpretation with its Army Contracting Officer, requesting a ruling on "the extent to which DynCorp properly assigned its personnel to labor categories in a manner permitted under [the Army's] Task Orders." (First Seybold Decl., Ex. C.)  On May 12, 2016, Northrop Grumman removed the case from the Circuit Court for Fairfax County to this Court pursuant to 28 U.S.C. § 1442. (Notice of Removal [Dkt. 1].)

     It appears that the discovery process in Fairfax County Circuit Court has been somewhat contentious.  Northrop Grumman asserts only after it had received much of the

documentation it was seeking from DynCorp through discovery was it able to engage an expert to conduct a comprehensive analysis of DynCorp's labor charges and assess their propriety under the contract. (*Id.* at ¶ 5.) Northrop Grumman further asserts that due to the drawn out nature of the production of these documents and the sheer volume of documentation, its expert was only able to complete his analysis on April 26, 2016. (*Id.* at ¶ 6.) This claim for interpretation seeks "a definitive answer to the question whether DynCorp properly assigned its employees to labor categories under Army Task Orders 3, 15, 20, and 21." (*Id.* at ¶ 8.)

There has been no change in the nature of DynCorp's contract-based counterclaims since it filed its Counterclaim on September 9, 2015. DynCorp's Counterclaims clearly identified the nature of its claims and that they were based on the Subcontract, which has been available to Northrup Grumman since the beginning of this litigation, and has not changed. In its Notice of Removal, Northrup Grumman argues that the now pending claim for contract interpretation before the Army Contract Officer establishes a potential federal ripeness defense, and it may now remove under 28 U.S.C. § 1442. (*Id.* at ¶ 8.)

DynCorp filed this motion for remand on May 17, 2016, arguing that removal under 28 U.S.C. § 1442 is improper in this case, that Northrup Grumman's notice of removal was not timely,

and that Northrup Grumman has waived any right to remove by its conduct in litigating the case in State court.  On June 2, 2016, the Court issued an order granting DynCorp's Motion and ordering the case remanded to State court.  This Memorandum Opinion explains the Court's rationale behind that order.[1]

## II. Legal Standard

Section 1442(a) of Title 28 of the United States Code provides that:

> A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office. . .

28 U.S.C. § 1442(a).  The Fourth Circuit has clarified that "to obtain removal under § 1442(a)(1) one must (1) be a federal officer 'or any person acting under that officer'; (2) 'raise a colorable federal defense'; and (3) 'show a nexus, a causal connection between the charged conduct and asserted official

---

[1] On June 3, 2016, the Court stayed execution of the remand pending a decision on an emergency motion to stay the order filed by Northrop Grumman.

authority.'" *Hurley v. CBS Corp.* --Fed. App'x--, 2016 WL
2609602, at *1 (4th Cir. May 6, 2016) (*quoting Jefferson Cty. v.
Acker,* 527 U.S. 423, 431 (1999) (internal citations omitted).
The Supreme Court and the Fourth Circuit have also clearly
indicated that § 1442(a)(1), unlike its diversity and federal
question removal counterpart statutes, must be "liberally
construed." *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 147
(2007); *Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872
F.2d 571, 576 (4th Cir. 1989).  This liberal construction is
necessary because "the broad language of § 1442(a)(1) must be
applied in a manner that effectuates the central congressional
policy of securing a federal forum for persons who assist the
federal Government in a manner that risks the imposition of
state law liability." *Stephenson v. Nassif*, No. 1:15cv1409
(TSE), 2015 WL 9450614, at *3 (E.D. Va Dec. 21, 2015).

Section 1446 of Title 28 describes the appropriate
removal procedure to invoke federal jurisdiction, and requires
the defendant seeking removal to file a timely notice of removal
stating the grounds for removal with the appropriate federal
district court.  28 U.S.C. § 1446(a)-(b).  In order to be
timely, "[t]he notice of removal of a civil action or proceeding
shall be filed within thirty days after the receipt by the
defendant, through service or otherwise, of a copy of the
initial pleading setting forth the claim for relief upon which

such action or proceeding is based." 28 U.S.C. § 1446(b).
However, in cases not involving removal based on diversity of
citizenship, "if the case stated by the initial pleading is not
removable, a notice of removal may be filed within 30 days after
receipt by the defendant, through service or otherwise, of a
copy of an amended pleading, motion, order, or other paper from
which it may first be ascertained that the  case is one which is
or has become removable." 28 U.S.C. § 1446(b)(3).  The thirty-
day window for removal is designed to prevent "undue delay in
removal and the concomitant waste of state judicial resources."
*Barbour v. Int'l Union*, 640 F.3d 599, 606 (4th Cir. 2011),
*abrogated on other grounds* by 28 U.S.C. § 1446(b)(2)(B) (citing
*Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 163 (4th Cir. 1997)).
If a defendant fails to seek removal within the thirty-day
window, the plain language of § 1446(b) dictates that a
defendant has forfeited the right to remove. *Barbour*, 640 F.3d
at 611.

Finally, even where the requirements for removal are
otherwise satisfied, the party seeking removal can "be held to
have waived its right to removal" through its conduct in
litigating the case in State court. *Estate of Krasnow v.
Texaco, Inc.*, 773 F. Supp. 806, 808 (E.D. Va. 1991).  Such a
waiver must "be clear and unequivocal." *Id.* (citing *Bedell v.
H.R.C. Ltd.*, 522 F. Supp. 732, 738 (E.D. Ky. 1981)).

10

### III. Analysis

Defendant's motion to remand hinges on the resolution of five broad issues.  First is the question of whether 28 U.S.C. § 1442(a) allows the original plaintiff to remove an action he or she originally chose to bring in State court based solely on the original defendant's counterclaims, where no new third-party defendants have been brought into the case.  Second, the Court must determine whether Northrop Grumman's argument on ripeness alleges a colorable federal defense as contemplated by § 1442(a) and the cases interpreting its requirements.  Third, the Court must determine whether a causal nexus exists between a government direction and Northrop Grumman's actions forming the basis of DynCorp's counterclaims (failure to pay DynCorp for actions performed under the Subcontract).  Fourth, the Court must determine whether Northrop Grumman's Notice of Removal, filed over seven months after DynCorp first filed its Counterclaims, was timely under 28 U.S.C. § 1446(b)(3). Finally, the Court must decide if Northrup Grumman has waived its right to remove by filing, arguing, and receiving a ruling on a demurrer to DynCorp's Counterclaims in State court.  Each of those issues must be resolved in Northrop Grumman's favor for removal to be proper.  If any one of those issues is resolved in favor of DynCorp, the case must be remanded back to State court. The Court will address each issue in turn.  Because the Court

11

finds that Northrop Grumman cannot definitively succeed on any
of these issues, the Court grants DynCorp's Motion to Remand and
remands the case back to the Circuit Court for Fairfax County.

### A.   Removal by Original Plaintiffs under § 1442(a)

While it is hornbook law that only the original
defendant may remove a case under 28 U.S.C. § 1441, the wording
of the statute providing for removal by federal officers, 28
U.S.C. § 1442, is clearly broader.  Critically, § 1441 provides
that an action may be "removed by the defendant or the
defendants," whereas § 1442(a) provides the action may be
removed by "any" party falling within the categories of federal
officers and their agents described therein, without any
explicit limitation as to their role in the case.  Accordingly,
courts have routinely held that third-party defendants may
remove under § 1442.  *See, e.g.*, *Thompson v. Wheeler*, 898 F.2d
406, 409 (3d Cir. 1990); *Johnson v. Showers*, 747 F.2d 1228, 1229
(8th Cir. 1984); *IMFC Prof'l Servs. Of Fla., Inc. v. Latin Am.
Home Health, Inc.*, 676 F.2d 152, 156 (5th Cir. 1984).  However,
Northrop Grumman has not identified any cases where the original
plaintiff was permitted to remove to federal court based solely
on the original defendant's counterclaims.  Northrup Grumman has
identified several district court cases which mention in dicta
their belief that under § 1442 an original plaintiff could
remove, but these cases all actually addressed removal by third

12

party defendants, and are not binding on this Court in any event. *See Alfa Mut. Ins. Co. v. Nicholson*, No. 1:13-cv-322-MEF, 2014 WL 903126, at *3 (M.D. Ala. Mar. 7, 2014); *MERS Inc. v. Rothman,* No. 04 C 5340, 2005 WL 497794, at *5 (N.D. Ill. Feb. 28, 2005) (mentioning in passing that "the principle prohibiting removal by a third-party defendant, cross-defendant, or cross-plaintiff . . . is inapplicable to removal pursuant to 28 U.S.C. § 1442," en route to holding that removal by a third-party defendant was appropriate).

Section 1442 must be construed generously to give effect to Congress's "policy of securing a federal forum for persons who assist the federal Government in a manner that risks the imposition of state law liability." *Stephenson,* 2015 WL 9450614, at *3. While this rationale permits a third-party defendant to remove under § 1442, there are reasons to be more skeptical of removal pursuant to § 1442 where it is the original plaintiff who seeks removal based solely on the original defendant's counterclaims. At least one district court has held that the original plaintiff who chose to file an action in State court cannot remove to federal court under § 1442 when faced with counterclaims by the original defendant. In *Federal Home Loan Mortgage Corp. v Litano*, the court held that Freddie Mac could not remove an action which it had originated as plaintiff in State court solely on the basis of the defendant's related

13

counterclaims.  No. 15-cv-10019-MAP, 2015 WL 3632334 at *1 (D. Mass. June 1, 2015).  Although *Litano* involved Freddie Mac's own removal provision, 12 U.S.C § 1452(f), that provision incorporates and relies on 28 U.S.C. § 1442.  *See* 12 U.S.C. § 1452(f) (Freddie Mac "shall be deemed to be an agency included in sections 1345 and 1442 of such Title 28").  In *Litano*, the district court was concerned about "a dubious practice on the part of Plaintiff, whereby it will initiate a summary process proceeding against an unrepresented party in the State court, then immediately seek to remove the case to federal court if that party retains counsel, resists the eviction, and asserts counterclaims." *Litano*, 2015 WL 3632334, at *1.  Although there is no indication that Northrop Grumman is engaging in this kind of repetitive gaming of the system, the concerns about forum shopping by a plaintiff seeking to discourage counterclaims that motivated the court in *Litano* are just as relevant in this case. Section 1442 is designed to give federal officers the chance to have their federal defenses heard and ruled upon by a federal court, not to give federal contractors a safe harbor after voluntarily setting sail into State court only to find the waters riskier than it first appeared.

Ultimately, the propriety of removal by the original plaintiff pursuant to § 1442 is a close issue.  It is also one which the Court need not resolve at this time.  For reasons

14

discussed below, Northrop Grumman has not satisfied the requirements for removal under § 1442 nor was its removal timely under 28 U.S.C. § 1446.  Therefore, even assuming, *arguendo*, that § 1442 does authorize removal by the original plaintiff in certain circumstances, this case would still not be eligible for removal, and the Court would still remand this action.

### B.   Colorable Federal Defense

In order to remove a case under 28 U.S.C. § 1442(a), the party seeking removal must raise a colorable defense based in federal law.  The party seeking removal need not show that the proposed defense will likely be successful or "win [its] case before [it] can have it removed." *Acker*, 527 U.S. at 431, 432.  "[I]ndeed, one of the most important reasons for removal is to have the validity of the [federal] defense . . . tried in a federal court." *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) (internal quotations omitted).  In assessing the proposed federal defense, the Court must "credit" the removing party's "theory of the case." *Acker,* 527 U.S. at 432.  However, the defense must be "based in federal law." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008).

Northrop Grumman argues that it has presented a federal defense to DynCorp's Counterclaims based on federal ripeness doctrine.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature

15

adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenged parties.'" *Nat'l Park Hospitality Ass'n. v. Dept. of the Interior*, 538 U.S. 803, 807-808 (2003) (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967)). Ripeness contains elements "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* (quoting *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993)). The Court will first address the prudential aspects of federal ripeness doctrine as they relate to Northrop Grumman's notice of removal before turning to the jurisdictional aspects of federal ripeness doctrine.

### 1.   Prudential Ripeness Concerns

So far as prudential ripeness would counsel in favor of waiting for the conclusion of the claim for contract interpretation before the Contracting Officer, ripeness doctrine does not provide Northrop Grumman with a true defense "based in federal law." As Northrop Grumman's memorandum admits its true defense to DynCorp's state law counterclaims is one based on Virginia state contract law. (*See* Pl.'s Mem. in Sup. [Dkt. 35] at 11-12 (citing *Tandberg, Inc. v. Adv. Media Design, Inc.*, No.

16

1:09-cv-863, 2009 WL 8705814, at *4 (E.D. Va. Dec 11,
2009)(under Virginia law, "[t]he party who commits the first
breach of a contract is not entitled to enforce it, or to
maintain an action thereon, against the other party for his
subsequent failure to perform"))).

Northrop Grumman's claim for contract interpretation
does not deal with the conduct or legal issues at the heart of
DynCorp's Counterclaims, but with different aspects of the Prime
Contract and the Subcontract.  DynCorp's Amended Counterclaims
are based on Northrop Grumman's withholding of payment for
services to which DynCorp claims it was entitled under the
contract.  (See Amended Counterclaim, Pl.'s Ex. 15 [Dkt. 1-20].)
Northrop Grumman's claim for contract interpretation asks the
Contracting Officer to decide whether DynCorp had previously
breached the contract by failing to comply with different
requirements, namely those involving labor mapping, which flowed
down from the Prime Contract to the Subcontract.  (Pl.'s Sealed
Ex. 1 [Dkt. 5-5].)  Northrop Grumman's claim for contract
interpretation, then, is only relevant to DynCorp's
Counterclaims insofar as it would help them establish that
DynCorp breached the contract prior to the cessation of payment,
which is a defense based on *state* contract law.  It is state
law, not federal ripeness doctrine, which would provide Northrup
Grumman with its ultimate defense to DynCorp's counterclaims.

17

Because ripeness is not truly Northrop Grumman's substantive defense but rather a prudential consideration counseling restraint pending the development of facts bearing on the validity of Northrop Grumman's actual, state law defenses, ripeness is not a "defense based in federal law," and the Court must remand the case back to State court.

### 2.   Jurisdictional Ripeness Concerns

Second, Northrup Grumman argues that constitutional ripeness should prevent this court from proceeding in this matter until the CDA process is completed, as the Subcontract requires this dispute to go through the CDA process before any claim can be brought in court. (Pl.'s Mem. in Supp. at 10.) As an initial matter, the Court disagrees with Northrop Grumman's assertion that the Subcontract requires any contract claim between the prime contractor and the subcontractor to proceed through the CDA mechanism. The relevant clause of the Subcontract, which Northrop Grumman claims requires completion of the CDA process before DynCorp can proceed with its counterclaims, provides that although DynCorp is a subcontractor, it must proceed through the dispute resolution process set forth in the CDA to challenge Government decisions regarding the contract if it "disagrees with any such decision *made by the Government.*" (Pl.'s Ex. A at 21 (Subcontract Clause No. 23.)(emphasis added)) If DynCorp was disputing a ruling or

18

decision made by the Government, it would need to proceed through the CDA's mechanism. It is not. It is pursuing an action against Northrop Grumman for its alleged failure to pay as required by the Subcontract between Northrop Grumman and DynCorp. The Subcontract contains no language requiring DynCorp to proceed through the CDA scheme in the event of a dispute between DynCorp and Northrop Grumman arising from their duties to each other under the Subcontract. Generally, the CDA is not held to extend to this kind of contract dispute between a prime contractor and its subcontractors. *See Riley Elec. Co. v. Am. Dist. Tel. Co.*, 715 F. Supp. 813, 818-19 (W.D. Ky. 1989) (the CDA does not extend to prime-subcontractor disputes); *Allied Sys. Co. v. Marinette Marine Corp.*, No. 95-268, 1995 WL 434340, at *3 (D. Or. July 19, 1995)(same); *United States v. Gust K. Newberg Constr. Co./F.H. Paschen Grp.*, No. 93 C 5219, 1995 WL 263415, at *3 (N.D. Ill. May 2, 1995)("[A] contracting officer cannot resolve disputes between a contractor and subcontractor.") Additionally, the Contracting Officer for the Prime Contract has previously indicated, in a slightly different context, that the Government does not believe that it needs to interpret or weigh in on issues relating to the duties Northrop Grumman and DynCorp owe each other under the Subcontract. (Def.'s Sealed Ex. 11 [Dkt. 17-10].) Finally, Northrop Grumman's conduct in this case suggests that even it formerly

19

believed that claims for contractual damages stemming from an alleged breach of the Subcontract did not need to go through the CDA mechanism before being ripe for determination.  Counts III and IV of Northrop Grumman's initial complaint sought damages for DynCorp's alleged breach of the Subcontract.  (Pl.'s Compl. [Dkt. 1-2] at ¶¶ 70-80.)

Furthermore, even if the Court was inclined to find that DynCorp had to exhaust the CDA's requirements before it could bring its action against Northrop Grumman, the result would be that DynCorp's counterclaims do not satisfy the constitutional, Article III requirements of ripeness.  Where the ripeness inquiry involves speculative administrative actions that may or may not take place, the ripeness inquiry involves the existence of a live case or controversy, and a case which is unripe "the court is without subject matter jurisdiction and must dismiss the case." *Com. Of Va. v. United States*, 926 F. Supp. 537, 545 (E.D. Va. 1995) (citing *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 1308 (1974)).  By arguing that DynCorp's Counterclaims are dependent on the uncertain future ruling of the Contracting Officer, which will either result in voluntary payment of the Counterclaims by Northrop Grumman or certain victory for Northrop Grumman in State court, Northrop Grumman is arguing against this Court being able to exercise subject matter jurisdiction over

DynCorp's Counterclaim.  If the Court was to agree with Northrop Grumman and find that it does not have subject matter jurisdiction over the case, then the Court would have to remand the case back to State court pursuant to 28 U.S.C. § 1447(c). *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.")  This bizarre catch-22 leads the Court to conclude that ripeness, as a judicial doctrine interpreting the limits of this Court's subject matter jurisdiction, is not the kind of "defense" contemplated by 28 U.S.C. § 1442.  28 U.S.C. § 1442 was designed to prevent State courts from overstepping their bounds and to ensure that federal officers and their agents are not improperly exposed to state law liability while performing their duties.  It was not intended to create a clever procedural two-step whereby parties could point to this Court's potential lack of jurisdiction to create limited jurisdiction for the sole purposes of dismissing the action.  Accordingly, to avoid a potential conflict between § 1442's grant of removal jurisdiction and § 1447(c)'s plain language requiring remand where the district court lacks subject matter jurisdiction, the Court reads the requirement of a "colorable federal defense" to exclude jurisdictional defenses.

Accordingly, even crediting Northrop Grumman's theory of the case, neither prudential nor constitutional

ripeness concerns could provide Northrop Grumman with a defense sounding in federal law to DynCorp's state law claims.  In any event, the court finds that the Subcontract does not require DynCorp's Counterclaims to go through the CDA's dispute resolution mechanism.  Accordingly, Northrop Grumman has failed to assert even a colorable federal defense, and thus has not satisfied the requirements for removal pursuant to § 1442(a), and the Court must remand the case back to State court.

C.   Causal Connection Between Northrop Grumman's

Actions and Asserted Federal Authority

For purposes of removal pursuant to 28 U.S.C. § 1442(a), "[a] 'causal nexus' between the claims at issue and a defendant's action under color of law exists when the claims arise as a consequence of the defendant carrying out the directives of a federal officer." *CRGT, Inc. v. Northrop Grumman Sys. Corp.*, No. 1:12cv554, 2012 WL 3776369 at *2 (E.D. Va. August 28, 2012) (citing *Winters v. Diamond Shamrock Chem. Co.*, 194 F.3d 387, 398 (5th Cir. 1998) (in turn citing *Willingham v. Morgan*, 395 U.S. 409 (1969))).  Where the party seeking removal exercised a great deal of autonomy or discretion in choosing to take the course of action which forms the basis of the non-removing party's claims, no causal nexus exists.  In *L-3 Communications Corp. v. Serco Inc.*, this Court found that there was no causal nexus in a case for tortious interference of

contract by the prime government contractor against the subcontractor where the prime contractor exercised substantial discretion in deciding who should receive the Subcontract.  39 F. Supp. 3d 740, 751 (E.D. Va. 2014).  In *CGRT, Inc. v. Northrop Grumman Systems Corp.*, on the other hand, this Court found that the causal nexus requirement was satisfied where the alleged act constituting the breach was the "proximate consequence" of an Army Contracting Officer's directive to terminate software usage which was the subject of the subcontract.  2012 WL 3776369, at *2.

Northrop Grumman's actions giving rise to DynCorp's Counterclaims in this case have more in common with the actions addressed in *L-3 Communications*, than they do the actions taken in *CRGT*.  Northrop Grumman is unable to identify any clear direction by a federal officer directing them to withhold payment from DynCorp or to cease using DynCorp's services. Northrop Grumman's decision to cease paying DynCorp for whatever reason it was taken appears to have been a decision undertaken by Northrop Grumman under its own initiative rather than as a result of Northrop Grumman "carrying out the directives" of a federal officer.  At most, Northrop Grumman can show that it was operating "under the general auspices of federal direction" on the contract when it ceased payments to DynCorp, but this is not sufficient to entitle Northrop Grumman to § 1442(a)(1) removal.

23

*L-3 Communications*, 39 F. Supp. 3d 740, 750 (quoting *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268, 1273 (C.D. Cal. 1998)). When Northrop Grumman asked the Government for direction on the issue of DynCorp's labor mapping issues, Northrop Grumman was told simply to "find a way to fit the work . . . under the existing labor categories," a direction which clearly contemplates discretion, and is a far cry from a directive to either terminate the use of DynCorp's services or to refrain from paying DynCorp for the time being. Because Northrop Grumman was acting on its own initiative in taking the actions forming the basis of DynCorp's counterclaims rather than acting "pursuant to an officer's direct orders or to comprehensive and detailed regulations," Northrop Grumman cannot satisfy the causal nexus requirement for removal under 28 U.S.C. § 1442(a).

## D.   Timeliness of Notice of Removal

Northrop Grumman contends that its notice of removal, filed some eight months after DynCorp filed its Counterclaim, is timely under 28 U.S.C. § 1446(b)(3). (Pl.'s Mem. in Opp. [Dkt. 43] at 24.) Northrop Grumman argues that it's claim for contract interpretation filed before the Army Contracting Officer on April 22, 2016, was an "other paper from which it may first be ascertained that the case is one which is or has become removeable." 28 U.S.C. § 1446(b)(3). However, this argument misses the mark. Crediting Northrop Grumman's theory of removal

under 28 U.S.C. § 1442, this case is removable because DynCorp's Counterclaims alleging breach of the Subcontract by Northrop Grumman are subject to a federal defense because they will not be ripe until the Army Contracting Officer has interpreted the contract and DynCorp has gone through the CDA dispute resolution mechanism.  While Northrop Grumman asserts that it did not have the information needed to compile a full and thorough claim for contract interpretation until it received its expert report on April 26, 2016, Northrop Grumman clearly had been preparing to file a claim for contract interpretation for some time before that.  Neither the filing, nor indeed the preparation of a claim for contract interpretation altered the nature of DynCorp's counterclaims based on the Subcontract.  Northrop Grumman has been privy to the contract for the entire life of this case, and has been on notice of the nature of DynCorp's counterclaims under the Subcontract since the Amended Counterclaims were filed on November 16, 2015, at the absolute latest.  In other words, Northrop Grumman's asserted "ripeness" defense should have been apparent to them from the moment that the Counterclaims were filed, and Northrop Grumman was thus on "unequivocally clear and certain notice that the case was removable" under § 1442(a) from that date.  *US Airways, Inc. v. PMA Capital Ins. Co.*, 340 F. Supp. 699, 704 (E.D. Va. 2004) (holding that receipt of notice of merger creating diversity of citizenship was "other paper"

for purposes of § 1446(b)(3)).  Indeed, it appears from Northrop

Grumman's answer to the Counterclaims that it was actually on

notice of any potential ripeness defense from the time the

Counterclaims were originally filed.  In its answer to the

Counterclaim, Northrop Grumman identifies, as its thirteenth

defense, its contention that "DynCorp's claims fail because they

are not ripe for adjudication."  (Pl.'s Answer to Def.'s

Counterclaims [Dkt. 1-23] at 13.)  Accordingly, this Court finds

that any theory of removability predicated on the ripeness of

DynCorp's Counterclaims accrued for purposes of 28 U.S.C. § 1446

at the time the Counterclaims were filed.

     The Fourth Circuit has established that § 1446(b) does

not require "that the 'motion, order or other paper' be part of

the state court record."  *Yarnevic v. Brink's, Inc.*, 102 F.3d

753, 755 (4th Cir. 1996).  However, all of the existing case law

presented on the "other paper" provision of § 1446(b)(3) in the

Fourth Circuit also deals with situations where the "other

paper" was generated by the non-removing party.  *See, e.g.,*

*Yarnevic* 102 F.3d at 755 (defendant's receipt of plaintiff's

memorandum on a motion was sufficient to trigger "other paper"

removal clock); *Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 161

(4th Cir. 1997) (removal appropriate under 1446(b)(3) where

diversity of citizenship was unclear in complaint and could only

be ascertained from the plaintiff's later filings).  Northrop

Grumman has not provided, and the Court cannot find, any cases where the later paper providing the basis for removal was generated by the party seeking removal on the basis of that document.

Accordingly, because Northrop Grumman's purported basis for removal was unequivocally clear from the time DynCorp filed its Counterclaim and the Court is hesitant to hold that Northrop Grumman can manufacture its own "other paper" at a later date for purposes of resetting § 1446(b)'s removal clock, the Court finds that Northrop Grumman's notice of removal was not timely and the case must be remanded.

### E.   Waiver of Right to Remove

DynCorp asserts that Northrop Grumman has waived its right to remove this case based on its conduct in Fairfax County Circuit Court, most importantly by filing, arguing, and receiving a ruling on a demurrer to DynCorp's Counterclaim.  In the case of *Estate of Krasnow v. Texaco, Inc.*, this Court held that "a state court decision on a demurrer constitutes such a waiver."  773 F. Supp. 806, 808 (E.D. Va. 1991).  Here, the State court issued a decision on Northrop Grumman's demurrer prior to Northrop Grumman filing its notice of removal, denying the demurrer as to several of DynCorp's Counterclaims.  Northrop Grumman argues that this case can be distinguished from *Estate of Krasnow* because the demurrer in this action was decided prior

27

to the filing of the claim for contract interpretation and the case becoming "clearly removable".  However, in light of the findings above regarding when the removablity of the case became apparent, Northrop Grumman's attempt to distinguish *Estate of Krasnow* is no longer viable.  Accordingly, the Court finds that Northrop Grumman has waived any right to remove this case by its actions in State court, and the case must be remanded.

### F.   DynCorp's Request for Attorney's Fees

"Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  While the Court finds that removal in this case was improper, it cannot conclude that Northrop Grumman's arguments were so obviously wrong or objectively unreasonable as to justify an award of attorney's fees.  Because Northrop Grumman's removal was improper, but was premised on a colorable, non-frivolous theory of removal, the Court declines to award attorney's fees.

### IV. Conclusion

For the foregoing reasons, Defendant's motion is granted in part.  The case is remanded back to State court, but no attorney's fees will be awarded.  This Memorandum Opinion

completes and explains the Order issued on this motion by this

Court on June 2, 2016.


                                            /s/
                        _____
June 6, 2016                    James C. Cacheris
Alexandria, Virginia       UNITED STATES DISTRICT COURT JUDGE